**In re MICROFAB, INC., Debtor.**

**Bankruptcy No. 87–11538–CJK.**

United States Bankruptcy Court,
D. Massachusetts.

Aug. 18, 1989.

See also, Bkrtcy., 105 B.R. 151, Bkrtcy., 105 B.R. 161.

Nancy Preis, Asst. Atty. Gen., Boston, Mass., for Commonwealth.

Gary Cruickshank, Boston, Mass., trustee.

Paul Samson, Boston, Mass., for Bay Bank Middlesex.

Wm. Baldiga, Joel Rosenthal, Boston, Mass., for Fleet Credit Corp. and New England Laminates, Inc.

CAROL J. KENNER, Bankruptcy Judge.

I. Introduction

The Debtor's bankruptcy estate includes real property (the "Site" [1]) that the Debtor

---

**1.** I use the term "Site" not only for convenience, but because the real estate is a Site as that term is defined in the Massachusetts Oil and Hazardous Materials Release Prevention and Response Act: "any building, structure, installation ... or any other place or areas where oil or hazardous

contaminated with hazardous substances before it filed its petition under Chapter 7 of the Bankruptcy Code in October, 1987. By the motion before the Court, the Commonwealth of Massachusetts (the "Commonwealth"), through its Department of Environmental Quality Engineering, seeks an order requiring the Chapter 7 Trustee of the Debtor's estate, to assess, contain, and remediate the contamination of the Site at the estate's expense. In the alternative, the Commonwealth asks for an order permitting the Commonwealth (in lieu of the Trustee) to assess, contain, and remediate the contamination and requiring the estate to pay any costs the Commonwealth thereby incurs as administrative expenses. The Trustee opposes the motion.[2]

On the basis of the evidence presented and for the reasons set forth below, I deny the Commonwealth's motion in both respects. I deny the request for an order requiring the Trustee to clean the Site because, although the Site poses a significant danger to the public health and safety, the Commonwealth has not shown that the Trustee can appreciably reduce the threat of harm even by expending all the funds of the estate. Also, I deny as premature the Commonwealth's request for administrative expense status; the Commonwealth has not yet expended funds to clean the Site, and any ruling I might render on future expenses would be speculative.

The evidence submitted in conjunction with this motion consists of the following. The Commonwealth submitted its evidence primarily through affidavits, seventeen in

all, which I list in the margin.[3] The Trustee had an opportunity to cross-examine all affiants; he cross-examined four: Brian Harrison Magee, Stephen M. Johnson, Arthur S. Johnson, and James T. Maughan.[4] The Commonwealth also submitted the deposition of M. Anthony Lally and an appraisal of the Site (dated December 28, 1987) prepared by Brown Brothers, Inc.[5] The evidence also includes admissions by the Trustee (made in his Response to the Commonwealth's Motion) to factual allegations the Commonwealth made in its motion. Neither the Trustee nor the Commonwealth submitted other evidence.

## II. Findings of Fact

### Background

For twenty years before it filed its petition under Chapter 7,[6] Microfab, Inc. ("Microfab") owned a Site in Amesbury, Massachusetts at which it did electroplating and manufactured printed circuit boards. The thirteen acre Site consists of a 68,000 square foot manufacturing plant, a wastewater treatment facility, and a large parking area. A stream runs across the Site, by the plant, and into a wetlands area that covers a large portion of the Site and much abutting property. The stream crosses the wetlands and ultimately flows into the Merrimac River approximately 8500 feet from the Site.

Abutting the Site are industrial facilities to the east and west and a large tract of forest and wetlands to the south. The

---

material has been deposited, stored, disposed of or placed, or otherwise come to be located." G.L. c. 21E, Sec. 2 (added by St.1983, c. 7, Sec. 5).

2. The Court has also received statements of opposition to the motion from two holders of general unsecured claims against the Debtor's bankruptcy estate: Fleet Credit Corporation (which also submitted a brief in support of its opposition) and New England Laminates, Inc. As unsecured claim holders, they are parties in interest. Nonetheless, only the Trustee can speak for the estate.

3. The Commonwealth submitted and relied on the affidavits of Kevin Connors, Doug Priest, Andrea Kick, Paul Pukk, Alex Schultheis, Donna

R. Bishop, Stephen M. Johnson (2), Mark Casey, Alba Flaherty, Kenneth Hulme, Mary Doyle, Robert Pender, Arthur S. Johnson, James T. Maughan, Heather Vick and Brian Harrison Magee.

4. For the cross-examination, re-direct and re-cross-examinations, see the transcript of the evidentiary hearing on the Commonwealth's motion, held February 17, 1989.

5. In the "Stipulations" they filed on February 17, 1989, the Trustee and the Commonwealth waived the signing of M. Anthony Lally's deposition.

6. Microfab filed its petition under Chapter 7 of the Bankruptcy Code on October 7, 1987.

surrounding area contains a mix of residential and industrial properties. Mary Doyle, one of the Commonwealth's affiants, counted approximately one hundred forty (140) residential properties in the general vicinity of the Site.[7] In addition, Microfab counts among its downstream neighbors at least one dairy farmer and his herd of cows.

During its twenty years of operations, Microfab regularly discharged hazardous substances—especially Volatile Organic Compounds ("VOCs") and heavy metals—onto the Site. During the early years, it discharged wastewater into a leaching field (over which it subsequently built an addition to its plant). Microfab also discharged hazardous materials directly into the stream and wetlands area until it built a wastewater treatment facility on the Site, though even that facility did not end the ongoing contaminated discharges. In addition to the long-term routine discharges, the Site also suffered a major spill of at least one thousand gallons of methylene chloride on January 26, 1987, just eight months before Microfab filed its petition in bankruptcy. All the contamination thus occurred pre-petition. The Trustee never operated Microfab's plant.

Microfab began assessing the nature and extent of the contamination, but, as of October, 1987, it had done little or no cleanup. During his tenure, the Chapter 7 Trustee has accomplished the following:

1. He has spent $108,000 to properly dispose of various vats, drums and barrels of chemicals on the Site; he employed personnel to remove contaminated pipes within the building.

2. In addition, the Trustee sought and obtained authority to expend $30,000 to address the methylene chloride spill; he also sought and obtained authority to expend $10,000 to erect a fence around the contaminated parts of the Site.

3. Early in the case, he employed a guard to monitor the Site; he also notified the local police and requested that they periodically check the Site.[8]

The assets of this estate are the Site and approximately $750,000 of unencumbered cash. The Site currently has no value. The Trustee held a public auction in January, 1988, but there were no bidders. He also tried to sell the Site privately, but no one has made an offer to buy.[9] The Trustee is not seeking to abandon the Site.

The parties agree that if the Site were rid of the contamination and the consequent environmental liability, it would have a fair market value of approximately $3,200,000. The Trustee states that the real estate is subject to a first mortgage held by BayBank Middlesex for approximately $1,200,000 [10]. If the Common-

---

7. The affidavits do not describe these properties with sufficient relevant detail to permit the Court to determine how they might be affected by the Site's contamination. For example, I do not know how far these properties are from the Site, whether any are situated on the stream, whether any rely on the ground water supply (for drinking water or otherwise) and, if so, whether they are situated in the path of the ground water flow.

8. Therefore, the Trustee has not taken lightly the possible effect of this Site contamination on the public's health and safety. The measures he has taken should be compared to those not taken by the Trustee in *Midlantic National Bank v. New Jersey Department of Environmental Protection,* 474 U.S. 494, 106 S.Ct. 755, 88 L.Ed.2d 859 (1986). In *Midlantic,* the lower court had permitted a trustee to abandon two highly toxic waste oil facilities. The Supreme Court noted with disapproval:

The trustee was not required to take even relatively minor steps to reduce imminent danger, such as security fencing, drainage and diking repairs, sealing deteriorating tanks, and removing explosive agents. Moreover, the trustee's abandonment at both sites aggravated already existing dangers by halting security measures that prevented public entry, vandalism, and fire.

*Midlantic,* 494 U.S. at 499 n. 3, 106 S.Ct. at 758 n. 3.

9. Even the Trustee's efforts to employ a real estate broker to market the Site proved unsuccessful. Apparently, prospective brokers believed that even acting as a broker for the Site might trigger liability under the state environmental statute.

10. To date, BayBank has not filed a motion seeking relief from stay. I have no evidence of the validity of the mortgage or the amount of

wealth records a superpriority lien pursuant to G.L. c. 21E, § 13, the Site will also be subject to a lien securing the Debtor's liability to the Commonwealth under G.L. c. 21E.[11] The Site thus constitutes a potential source of funds out of which to pay for its own remediation. This Court has ruled that the Commonwealth has the right to record a superpriority lien on the Site,[12] so the focus of the present motion is on the $750,000 of unencumbered cash the Trustee is holding.

The cost of the environmental cleanup is still unknown. The Commonwealth has studied the Site extensively, but it must perform still more research before it can produce a reliable plan and budget for remediation.[13] Nonetheless, on the basis of its experience with other hazardous waste sites, the Commonwealth estimates that the cost of assessing, containing and remediating the contamination at the Site would total between $1,660,000 and $1,990,-000. (This is only an estimate; the Commonwealth could not assure the Court that the total would not exceed $2,000,000.) Therefore, by the Commonwealth's own estimate, the $750,000 at issue here will not be sufficient to clean the Site. The Court has no evidence as to what, if anything, can be achieved with the $750,000.

The parties are stalemated. The Trustee cannot sell the Site, but he has insufficient funds to clean it. The Commonwealth, which failed to file a lien on the Site prior to the filing of the bankruptcy petition and which never filed a general, unsecured claim against the estate (the filing deadline for such claims has passed), thus far has declined to clean the Site as well. The Commonwealth has announced its intention to see to it that the Site is remediated, but it has provided no assurance to the Court that should the Trustee undertake the cleanup effort and exhaust his resources before the remediation were complete, the Commonwealth would fund the remainder of the cleanup. Moreover, the Commonwealth has not finally quantified its claim. This discourages prospective purchasers from bidding on the Site and makes it impossible for the Trustee to determine whether cleaning the Site would produce a benefit for the estate.

## Current Condition of the Site and Risks it Creates

The bulk of the Commonwealth's evidence concerns itself with identifying the contaminants present on the site. It sets forth what the Commonwealth has learned about the prevalence, concentration, toxicity, location and movement of each contaminant.

The Commonwealth has identified approximately twenty contaminants present in various concentrations. Virtually all of them are present in concentrations that render them hazardous according to state and federal regulatory standards. They are present in the soil, the groundwater, the stream (both on-Site and off-Site) and the sediment in the stream.

The contamination centers in the southwest corner of the Site. The Site is roughly square. The stream crosses the Site, running from north to south along the west side of the Site, which is approximately 900 feet in length. The elevation of the Site and the stream drops approximately thirty feet from the northern border of the Site to the southern. The former leaching field is situated close to the stream near the northern edge of the property. Approximately halfway between the north and south borders, the stream enters wetlands that cover most of the southwest quadrant of the Site. In this quadrant, the stream is joined by an effluent discharge stream from the wastewater treatment plant. Just east of the

---

the debt. The Court has no evidence of any other encumbrances on the real estate.

**11.** The Commonwealth failed to record any lien prior to the filing of Microfab's Chapter 7 petition. It must comply with G.L. c. 21E by recording a lien notice in order to have secured creditor status. *In re Hemingway Transport, Inc.,* 73 B.R. 494, 506 (Bankr.D.Mass.1987).

**12.** See Memorandum of Decision, entered today.

**13.** At a hearing in February, 1989, almost one and one half years after this case was filed, the Commonwealth still could not quantify with any precision the ultimate total cleanup costs.

area where these two streams converge is the location of the January, 1987 methylene chloride spill. The movement in the ground water, too, appears to be toward the southwest corner; that is where groundwater tests show contaminants appearing in the largest concentrations.

Tests done on the stream in January, 1989, show that, as the stream crosses the Site, it becomes heavily contaminated with heavy metals (in the sediment) and VOCs, especially with methylene chloride, which is present at extremely high levels. The experts conclude the contaminants are entering the stream from the soil and groundwater. The stream was cleanest near where it entered the Site and was most contaminated near the southern border. Tests performed downstream revealed that the concentrations diminished the further the stream moved from the Site, but that serious levels were still present well downstream. The Commonwealth's experts conclude that none of the life usually found in a stream of this kind could long survive among these contaminants, and their observations bear out their conclusions.

The groundwater too is highly contaminated with VOCs, especially with methylene chloride. The highest concentrations of groundwater contaminants were found in testwell # 8, which is located about one hundred feet east of the stream, close to the southern boundary of the property. The Commonwealth's experts conclude that the contaminants are migrating in the groundwater in a plume aimed generally from the center of the Site toward the stream and wetlands in the southwest corner of the property. (This is the most serious plume, but at least one other has been identified.) Moreover, they conclude that the contaminated groundwater is probably migrating off-site, though at a fairly slow rate, and contributing to the contamination of the stream.

The contamination of this Site cannot easily be separated into discrete areas and kinds of contamination that can be ranked according to degree of seriousness and remediated separately from each other. The methylene chloride is in the soil, the groundwater, the surface water, and the sediment in the stream. The soil contamination contributes to the groundwater contamination, which in turn contributes to the surface water contamination. And it is clear that the contamination cannot be contained and restricted to the Site. Contamination now flows off-site in the surface water; and over time, it will continue to spread through the ground water. The risks posed by these contaminants are not limited to those created by exposure to the groundwater. Exposure could also occur through the stream water both on-site and off-site. It can occur in a number of ways: by absorption through the skin, by inhalation of gaseous VOCs and by ingestion.

The remediation technology does not permit the removal of just methylene chloride. The technology for removing methylene chloride from the groundwater (a "pump and treat" method in which VOCs are stripped from the water) will simultaneously remove the methylene chloride and the other VOCs present in the groundwater. And to the extent that remediation requires soil removal, all the contaminants in the soil will be removed, not just the most concentrated and toxic of them. The cleanup may take several years.[14]

III. Issues

The Commonwealth's motion presents two basic issues:

1. Does 28 U.S.C. § 959(b) or the United States Supreme Court's decision in *Midlantic National Bank v. New Jersey Department of Environmental Protection*, 474 U.S. 494, 106 S.Ct. 755, 88 L.Ed.2d 859 (1986) require the Chapter 7 Trustee to remediate the contamination at the Site?

2. If the Commonwealth or the Trustee were to expend funds to clean the Site, would it or he be entitled to claim administrative expense status for those expenditures?

---

**14.** The Commonwealth's counsel estimated it might take 10 years to complete the cleanup.

Page 57, Transcript of hearing of July 26, 1988.

The Trustee's position is that he has removed any threat of imminent harm to public safety and health and that he has satisfied his duty under *Midlantic* and the Bankruptcy Code. Because he has acted only as a liquidating trustee and has never operated the plant, he maintains that 28 U.S.C. § 959(b), which requires a trustee to manage and operate property in accordance with valid state laws, is inapplicable.

The Commonwealth disagrees. It argues that the Site remains contaminated; that the contamination violates state and federal environmental laws; and that 28 U.S.C. § 959(b) and *Midlantic* require the Trustee to bring the Site into full compliance with those environmental laws. Also, if the Commonwealth or the Trustee cleans the Site, the Commonwealth argues, the cleanup expenditures should have administrative expense status.

█ For the reasons set forth below, I conclude as follows. The Site poses a significant risk of imminent and identifiable harm to the public health and safety. Therefore, had Microfab not sought the protection of the Bankruptcy Code, it would now be required under Massachusetts environmental law (especially G.L. c. 21E, §§ 9 and 11) to remediate the contamination. Under Chapter 7 of the Bankruptcy Code, environmental cleanup obligations would generally be treated as claims, not as specific performance obligations to be satisfied on an administrative expense basis; but the Supreme Court's decision in *Midlantic* has created an exception to this rule. In effect *Midlantic* requires a Chapter 7 trustee to bring contaminated estate property into compliance with state environmental laws on an administrative expense basis. However, *Midlantic*'s requirement is subject to several conditions,

one of which applies here: the trustee need not expend estate assets on a remediation effort where he does not have sufficient resources to achieve appreciable results. The Commonwealth has failed to demonstrate that the Trustee could achieve appreciable results with the assets at his disposal; the evidence suggests that he could not. Therefore, I deny the Commonwealth's request for an order requiring the Trustee to remediate the Site.

█ I also deny as premature the Commonwealth's request for an order allowing as administrative expenses the expenditures incurred by the Commonwealth (or the Trustee) in remediating the Site. The Commonwealth has not yet expended any funds to clean the Site. I cannot speculate as to what amounts might eventually be allowable as "actual" and "necessary" expenses of the estate, 11 U.S.C. § 503(b)(1)(A); and I do not know, and will not know until the end of the case, whether the estate will have sufficient funds to pay all administrative expenses in full.

## IV. State Environmental Law

Whether a Chapter 7 Trustee must remediate contaminated estate property on an administrative basis is ultimately a matter of bankruptcy law. But the obligation to remediate must originate in non-bankruptcy law—that is, in state or federal environmental laws. If the environmental laws do not give rise to an obligation to remediate, then *a fortiori* neither will the bankruptcy laws. Therefore the Court must first determine whether non-bankruptcy law would have required Microfab to remediate the Site.

The Commonwealth argues that Microfab had an obligation to remediate the Site under G.L. c. 21E.[15] The Trustee does not

---

**15.** G.L. c. 21E, § 9, par. 2 states:
Whenever in the opinion of the department release [sic] or threat of release poses a significant danger to the public health, safety, welfare or the environment, the department may issue to any person causing or legally responsible for such release or threat of release an order requiring such person to conduct such containment and removal actions, consistent with the Massachusetts contingency plan, as the department reasonably deems necessary.

G.L. c. 21E, § 11, par. 3 states:
The superior court department of the trial court shall have jurisdiction to enjoin violations of, or grant such additional relief as it deems necessary or appropriate to secure compliance with, the provisions of this chapter, or any order or regulation issued or adopted thereunder upon the petition of the attorney general or the commissioner.

concede this point, but neither does he seriously contend otherwise.[16] I find that the hazardous materials released on the Site pose a significant danger to the public health, safety and welfare and to the environment. I conclude that under sections 9 and 11 of G.L. c. 21E, the Massachusetts Oil and Hazardous Material Release Prevention and Response Act, Microfab would have been required to remediate the Site.[17]

## V. The Treatment of Cleanup Obligations in Chapter 7

### A) *The General Rule*

■ The Bankruptcy Code does not expressly mention environmental cleanup obligations and provides no special guidance as to how they should be treated in bankruptcy. The Code's treatment of environmental cleanup obligations must be inferred from various general provisions: the definition of "claim" in § 101(4)(B); the definition of "administrative expense"; the scope of the trustee's abandonment powers; and the rules governing priority in the distribution of assets of the estate, §§ 726 and 507. From these provisions and the cases interpreting them, I conclude that, as a general rule, an environmental cleanup obligation should be treated as a claim, not as a specific performance obligation that the Trustee must carry out on an administrative expense basis.

The definition of "claim" set forth in 11 U.S.C. § 101(4)(B) makes clear that the policy of the Bankruptcy Code is to treat a right to an equitable remedy as a right to the payment of money if the right to an equitable remedy gives rise to a right to payment.[18] See also 11 U.S.C. § 502(c)(2). In *Ohio v. Kovacs*, 469 U.S. 274 (1985) at 279, 105 S.Ct. 705 at 708, 83 L.Ed.2d 649, the Supreme Court ruled that the phrase "right to an equitable remedy for breach of performance" includes a state's right to an equitable remedy for violation of its environmental laws. Therefore, § 101(4)(B) requires that the relief the Commonwealth seeks—a right to an equitable remedy in the form of an order to clean the property—be treated as a claim if the Commonwealth's right to an equitable remedy gives rise to a right to payment.

Clearly it does, primarily because the obligation to remediate this Site can be carried out only by the payment of money.[19] The Trustee cannot remediate the Site himself; he would have to pay a contractor to do it. Another reason to regard this right to an equitable remedy as a right to payment is that the Commonwealth's own statute regards it as such. Section 13 of G.L. c. 21E states plainly: "Any liability to the commonwealth under this chapter shall constitute a debt to the commonwealth." I conclude that the Commonwealth's right to an equitable remedy should be treated as a claim.

This conclusion is supported by the rules for distribution of the assets of a Chapter 7 estate, 11 U.S.C. §§ 726 and 507. These rules create an order of priority for the payment of claims. They indicate that certain kinds of obligations should be given priority over others, but they give no special status to environmental claims. Congress thus has considered and decided

---

**16.** He does not maintain that the Site is uncontaminated, only that it does not pose such an imminent danger as to require him to expend estate funds to bring it into full compliance with environmental laws.

**17.** Having concluded that G.L. c. 21E would require Microfab to remediate the Site, the Court need not consider the other bases of liability the Commonwealth advances.

**18.** Section 101(4)(B) states:
"claim" means—(B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, ma-

tured, unmatured, disputed, undisputed, secured or unsecured.

**19.** As Justice Rehnquist noted in his *Midlantic* dissent, "[the States'] interest in these cases lies not just in protecting public health and safety but also in protecting the public fisc." *Midlantic*, 474 U.S. at 516, 106 S.Ct. at 767. Here, the Commonwealth, for all its exclamations of dire environmental threat, has done nothing in more than 2½ years to actually remediate the contamination. What the Commonwealth is seeking to protect here is not only the environment and the public health, but its financial interests as well.

which claims should be given special treatment. This Court cannot add categories that Congress did not see fit to include. In summary, I find that the Bankruptcy Code shows an intent to treat environmental cleanup obligations as claims [20] and to honor them as general unsecured claims according to the rules governing priority in the distribution of assets of the estate.[21]

I further hold that 28 U.S.C. § 959(b) does not require a Chapter 7 trustee to clean contaminated real estate. That statute commands a trustee to "manage and operate the property in his possession ... according to the requirements of the valid laws of the State." In this case, the Trustee has neither managed nor operated Microfab's property. See the discussion on this issue in *Matter of Scott Housing Systems, Inc.*, 91 B.R. 190, 195–196 (Bankr.S.D.Ga.1988), which I follow.

B) *The Exception*

In *Midlantic*, 474 U.S. 494, 106 S.Ct. 755, the Supreme Court recognized a judicially created exception to the general rule treating environmental cleanup obligations as general unsecured claims. *Midlantic* did not address whether the Trustee must satisfy environmental cleanup obligations on an administrative expense basis. Rather, it held that a Chapter 7 trustee cannot abandon property without satisfying certain conditions designed to protect the public health and safety. *Midlantic* does not clearly define those conditions, but the cases agree that if the Trustee cannot abandon property without satisfying certain conditions, neither can he maintain or possess it without satisfying them, and the costs of satisfying the conditions are administrative expenses of the estate. See, for example, *In re Wall Tube & Metal Products Company*, 831 F.2d 118, 122 (6th Cir.1987); *In re Smith–Douglass, Inc.*, 856 F.2d 12, 17 (4th Cir.1988).

Courts do not agree on the conditions that *Midlantic* requires a trustee to satisfy. Some courts construe *Midlantic* to require full compliance with environmental laws, at least where the laws are reasonable and the harm not merely speculative.[22] Others state that the trustee need only satisfy such minimal conditions as the Bankruptcy Court deems will adequately protect the public's health and safety.[23] Their disagreement arises from ambiguity in the operative language from *Midlantic*.[24]

**20.** Neither *Reading Co. v. Brown*, 391 U.S. 471, 88 S.Ct. 1759, 20 L.Ed.2d 751 (1968) (Post–petition tort of Chapter 11 trustee is an administrative expense.) nor *In re Charlesbank Laundry, Inc.*, 755 F.2d 200 (1st Cir.1985) (Contempt judgment for debtor-in-possession's post-petition violation of injunction requiring it to abate a nuisance is an administrative expense.) requires a different result because neither of these applies to a Chapter 7 trustee.

**21.** This does not necessarily set environmental authorities at a disadvantage. See Justice O'Connor's remarks in her concurring opinion in *Kovacs*, 469 U.S. at 285–286, 105 S.Ct. at 711. She indicates that "a State may protect its interest in the enforcement of its environmental laws by giving cleanup judgments the status of statutory liens or secured claims." In fact, the Commonwealth has enacted a law that gives its environmental authorities the ability to obtain that status. See G.L. c. 21E, § 13. The Commonwealth did not do so in this case, but I see no reason why it could not have recorded a lien (before the Debtor filed its petition in bankruptcy) that would have given the Commonwealth a right superior to the Trustee's in all the assets now in dispute.

**22.** The cases that most clearly take this position are *In re Wall Tube & Metal Products Company*, 831 F.2d 118 (6th Cir.1987); *In re Peerless Plating Company*, 70 B.R. 943 (Bankr.W.D.Mich. 1987); *In re Stevens*, 68 B.R. 774, 782, esp. n. 7 (D.Me.1987); *In re Smith–Douglass, Inc.*, 856 F.2d 12, 16 (4th Cir.1988).

**23.** See *In re FCX, Inc.*, 96 B.R. 49 (Bankr.E.D.N.C.1989) and *In re Franklin Signal Corporation*, 65 B.R. 268 (Bankr.D.Minn.1986).

**24.** *Midlantic* states:

"We conclude that Congress did not intend for Sec. 554(a) to pre-empt all state and local laws. The Bankruptcy Court does not have the power to authorize an abandonment without formulating conditions that will adequately protect the public's health and safety. Accordingly, without reaching the question whether certain state laws imposing conditions on abandonment may be so onerous as to interfere with the bankruptcy adjudication itself, we hold that a trustee may not abandon property in contravention of a state statute or regulation that is reasonably designed to protect the public health or safety from identified hazards.

■ This Court concludes that *Midlantic* requires full compliance with state environmental laws. To conclude otherwise would be to disregard *Midlantic's* repeated and persistent focus on state laws and regulations designed to protect the public's health and safety, not just on "the public's health and safety" generally considered. See footnote 24 above and *In re Peerless Plating Company,* 70 B.R. at 946–947 & n. 1. Nonetheless, *Midlantic* also makes clear that its requirement of full compliance is subject to several conditions and limitations. First, the trustee can be bound only by environmental laws that are reasonably calculated to protect the public health or safety from imminent and identifiable harm. See *Midlantic,* 474 U.S. at 507, 106 S.Ct. at 762; *In re Peerless Plating Co.,* 70 B.R. at 947. Second, the trustee cannot be prohibited from abandoning the property and required to remediate it if the environmental law violation that would be caused by abandonment would merely be speculative or indeterminate. See *Midlantic,* 474 U.S. at 507, 106 S.Ct. at 762; *In re Peerless Plating Co.,* 70 B.R. at 947. Third, the environmental law must not be so onerous as to "interfere with the bankruptcy adjudication itself." [25] *In re Wall Tube and Metal Company,* 831 F.2d at 122, n. 13; *In re Peerless Plating Company,* 70 B.R. at 947. And fourth (or perhaps this is a subcategory of the third), the trustee cannot be ordered to comply with a cleanup obligation

that he does not have the financial resources to satisfy. *In re Smith–Douglass, Inc.,* 856 F.2d at 17; *Matter of National Smelting of New Jersey, Inc.,* 49 B.R. 1012, 1014–1015 (D.Colo.1985).

### C) *Application*

The violation posed by this Site is neither speculative nor indeterminate. The Site poses a threat of imminent and identifiable harm to the public health and safety. And in doing so, it violates G.L. c. 21E. That statute is reasonably designed to protect the public health and safety against imminent and identifiable hazards. Therefore, I find that the Commonwealth has satisfactorily answered the first two considerations enumerated in the preceding paragraph.

The Commonwealth's evidence, however, fails to satisfy the Court's concerns arising under the third and fourth considerations. The evidence shows that if the Trustee were to expend all the estate's funds in an attempt to clean the Site, he would fail in achieving full compliance with the state environmental statute.[26] I cannot order the Trustee to spend the estate's funds without some assurance that by doing so, he would significantly improve the condition of the Site. No court of equity can require a trustee simply to throw money away, even in the name of a worthy cause.[27]

This exception to the abandonment power vested in the Trustee by § 554 is a narrow one. It does not encompass a speculative or indeterminate future violation of such laws that may stem from abandonment. The abandonment power is not to be fettered by laws or regulations not reasonably calculated to protect the public health or safety from imminent and identifiable harm."
*Midlantic,* 474 U.S. at 506–507 & n. 9, 106 S.Ct. at 762 & n. 9. The second sentence in the above passage seems to contemplate a separate bankruptcy standard pursuant to which the Bankruptcy Courts would formulate on a case-by-case basis "conditions that will adequately protect the public's health and safety"; however, the remainder of the passage appears to contemplate compliance with state laws reasonably calculated to protect against imminent and identifiable harm.

25. *Midlantic* expressly did not reach the question "whether certain state laws imposing conditions on abandonment may be so onerous as to

interfere with the bankruptcy adjudication itself." *Midlantic,* 474 U.S. at 507, 106 S.Ct. at 762.

26. The Commonwealth has announced its intention to see to it that the Site is remediated, but it has provided no assurance to the Court that should the Trustee run out of money before the remediation is complete, the Commonwealth will fund the remainder of the cleanup. Nor do I know whether, after all estate funds are expended, the Commonwealth will assure prospective buyers that it will not seek to impose further liability on them under G.L. c. 21E. Without such an assurance, the Site will remain unsaleable and unavailable as a source of funding for the cleanup.

27. As Justice Rehnquist cogently observed in his dissent:
"The Bankruptcy Court may not, in the exercise of its equitable powers, enforce its view

By the Commonwealth's own estimate, the Site will require $1,660,000 to $1,990,000 to remediate. That would leave the remediation effort underfunded by at least $910,000, and perhaps by as much as $1,240,000. I conclude that the Trustee cannot remediate the property entirely.

The Commonwealth has failed to show that the Trustee could significantly improve the condition of the Site with the estate's limited assets.[28] The Commonwealth has not yet formulated a plan or budget of remediation. Nor has it submitted evidence as to what can be achieved with the available funds. Moreover, the Commonwealth has not asked for anything less than full remediation.

Even if the Commonwealth had shown that the Trustee could significantly improve the condition of the Site, the Court could not authorize the Trustee to pay the funds of the estate over to the Commonwealth or to an environmental remediation contractor before the Commonwealth or the contractor had incurred the cleanup costs for which they seek compensation. Bankruptcy Courts typically, at the end of a case, rule on and allow administrative expenses only after those expenses have been incurred. To do otherwise would be tantamount to issuing an advisory opinion. Section 503(b)(1)(A) of the Bankruptcy Code contains the rationale for this practice: administrative expenses must be both "actual" and "necessary." If the Court were to rule on administrative expenses before they were incurred, the Court could

not be certain that the claimant would actually incur the expenses for which it seeks advance payment, nor could it be certain that the expenses eventually incurred would be necessary. Moreover, the Court cannot determine until the end of the case whether all administrative expenses can be paid in full or whether (because the total funds in the estate are less than the total amount of allowed administrative claims) only a pro-rata distribution to administrative expense claimants can be made. I see no reason in this case to diverge from the practice of ruling on administrative expense claims only after they have been incurred and only at the end of the case. So to the extent that this motion seeks the allowance of administrative expenses, the motion is denied.[29]

## VI. Conclusion

For the reasons set forth above, the Commonwealth's motion is denied. A separate order shall issue accordingly.

of sound public policy at the expense of the interests the Code is designed to protect." *Midlantic,* 474 U.S. at 514, 106 S.Ct. at 766.

28. What evidence I have about the remediation process indicates that before the remediating actually begins, significant sums must be invested in further research and installation of equipment. I have no estimate of the costs of these procedures, but it seems possible that they could use so large a portion of the available funds that relatively little would remain to carry out the remediation itself.

29. The Court notes that, by a separate memorandum issued today, it holds that under G.L. c. 21E, § 13, the Commonwealth can record a

"superpriority" lien against the Site. Such a lien would allow the Commonwealth to pay for the remediation with the sale proceeds of an asset that is otherwise of no value to either the Commonwealth or the estate. Therefore, although the Court cannot now determine the validity, priority, or eventual amount of any lien the Commonwealth may henceforth record, the availability of such a lien can only help balance the Commonwealth's interest in protecting the public health and safety, which formed the basis for the *Midlantic* ruling, with the interest of *Microfab's* creditors in preserving and maximizing the estate's assets for their own benefit.