**In re FCX, INC., ID #: 56–0220040, Debtor.**

**Bankruptcy No. S–85–01574–5.**

United States Bankruptcy Court, E.D. North Carolina.

Feb. 3, 1989.

William H. McCullough, Raleigh, N.C., for debtor.

Michael E. Weddington, Amos U. Priester, IV, Raleigh, N.C., for Committee of Subordinated Debenture Holders.

Nancy E. Scott, Associate Atty. Gen., Dept. of Justice, Raleigh, N.C., for State of N.C.

Jon A. Mueller, U.S. Dept. of Justice, Washington, D.C., for U.S. Environmental Enforcement Section.

Lacy H. Reaves, Raleigh, N.C., for Unsecured Creditors' Committee.

## MEMORANDUM OPINION AND ORDER

A. THOMAS SMALL, Bankruptcy Judge.

The matter before the court is the "Notice of Intention to Abandon Property" filed by the debtor on October 21, 1988, and the objections to the proposed abandonment filed by the United States of America on behalf of the Environmental Protection Agency ("EPA") and the State of North Carolina (collectively referred to in this opinion as "the governments"). A hearing was held in Raleigh, North Carolina on January 20, 23, 24, and 25, 1989.

The debtor, with the support of the Unsecured Creditors' Committee and the Committee of Subordinated Debenture Holders, seeks to abandon what was once FCX's pesticide blending facility in Statesville, North Carolina. It is undisputed that the cost of pesticide removal and remediation in accordance with EPA's standards exceeds the value of the property. At issue is whether the property poses an imminent threat to public safety.

## JURISDICTION

This bankruptcy court has jurisdiction over the parties and subject matter of this proceeding pursuant to 28 U.S.C. §§ 1334, 151, and 157 and the General Order of Reference entered by the United States District Court for the Eastern District of North Carolina on August 3, 1984. This is a "core proceeding" pursuant to 28 U.S.C. § 157(b)(2)(A), (B), and (O), which this court may hear and determine.

## FACTS

*Background*

FCX, Inc., a North Carolina farmers' purchasing and marketing cooperative, filed a voluntary petition under chapter 11 of the Bankruptcy Code on September 17, 1985. The debtor's reorganization strategy was to liquidate its assets in an orderly manner and distribute proceeds to creditors. One of the properties to be sold was the debtor's distribution center, formerly a pesticide blending plant, in Statesville, North Carolina. In February, 1986, Southern States Cooperatives, Inc. ("Southern States"), a prospective purchaser of the facility, hired Fred C. Hart Associates ("Hart") to investigate the site for possible environmental problems. Hart took soil samples and installed four wells to test the ground water. The results of the tests were included in a written report which was furnished to Southern States and to the debtor. The Hart Report disclosed the presence of hazardous substances in the soil and ground water and, quite under-

standably, Southern States lost interest in the sale. FCX, with court approval, hired its own environmental consultants, Dr. C. Page Fisher and Charles A. Purcell, Jr., who conducted their own examination and on May 2, 1986, FCX transmitted to EPA a "Notification of Hazardous Waste Site" ("Exhibit 2"). The notification, which is required by Section 103 of the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9603, as amended by the Superfund Amendments and Reauthorization Act of 1986 ("SARA"), Pub.L. No. 99–499, 100 Stat. 1613, identified FCX as "FCX, Inc., Debtor and Debtor in Possession" and generally described the nature of the problem.

The confirmation process continued after the notification, but for some reason, neither EPA nor the State of North Carolina received a copy of the debtor's disclosure statement or plan or notice of the confirmation hearing. The debtor's plan of reorganization was confirmed on August 4, 1986, and provides for the orderly sale of the estate's assets and distribution of the sale proceeds to the debtor's creditors.[1] The debtor's disclosure statement discussed the environmental problem at Statesville and stated that costs of clean up "would constitute a cost of administration in this case." (Disclosure Statement of FCX, Inc., June 6, 1986, at page 6.) The plan, however, does not directly address the payment of clean up costs at Statesville or any other location. The debtor has acknowledged liability under CERCLA for the clean up costs of the Statesville plant,[2] but contends that, notwithstanding CERCLA and prior representations, those costs are not costs of administration if the property is abandoned.[3] The property, five acres on West Front Street in Statesville, North Carolina, has a value in an uncontaminated condition of approximately $700,000. Clean up costs under CERCLA have been estimated by EPA to be between $900,000 and $1,300,000.

*The Statesville Problem*

For many years, beginning in the early 1940's and continuing to 1969, the debtor operated a feed mill and pesticide blending plant at its Statesville property. No one disagrees that hazardous pesticides are buried at the site, but the exact nature, amount, and location of the toxic chemicals are not known. Former FCX employees have been interviewed and have identified three occurrences which give cause for concern. First, in 1969, FCX dumped approximately five tons of "off spec" pesticides, most likely DDT, Chlordane, DDE, Dieldrin, and possibly Lindane, into a pit which is estimated to be 10 feet deep, 8 feet long and 8 feet wide. The precise location and depth of the pit has not been ascertained,[4] but it is known that the pit was filled in with soil and covered with a reinforced

1. Under the plan, the debtor's sole secured creditor, Columbia Bank for Cooperatives, agreed to reduce its secured claim of approximately $60,000,000 to permit the class of unsecured creditors (claims of approximately $12,000,000) and the class of subordinated debenture holders (claims of approximately $8,600,000) to participate in the distribution of encumbered assets. The plan provides for the class of unsecured creditors to receive at least $5,000,000 and for the class of subordinated debenture holders to receive the proceeds of specific FCX investments provided that those proceeds are not needed to pay the compromised claim of Columbia Bank for Cooperatives and the minimum distribution of $5,000,000 to unsecured creditors.

2. See Judge Fox's Order of December 29, 1988, at page 10.

3. Whether the EPA or the State of North Carolina would have an unsecured claim for the clean up costs is not before the court. No debt to EPA or the State of North Carolina for hazardous waste sites is listed in the debtor's schedules and neither the EPA nor the State of North Carolina has filed a proof of claim in this case. *See Maressa v. A.H. Robins Co.*, 839 F.2d 220 (4th Cir.1988) and *Grady v. A.H. Robins Co.*, 839 F.2d 198 (4th Cir.1988). This court has already determined in an order entered December 30, 1988, that the State of North Carolina shall have a cost of administration priority in the amount of $9,312.01 for its investigative costs in connection with the Statesville site and a cost of administration priority claim for the clean up costs in connection with the debtor's site in Washington, North Carolina, which is also contaminated.

4. In January, 1989, a contractor hired by EPA unsuccessfully attempted to locate the pit by digging 22 holes through the warehouse floor.

concrete slab. Subsequently, FCX built a warehouse over the buried pesticides which is 73,000 square feet in size.

The second event, perhaps coinciding with the first, involved the burying of 50 to 100 one gallon glass bottles of liquid DDT. One employee recalled that many of the bottles broke when they were thrown into a pit. These bottles of liquid DDT may be in the same pit as the first chemicals, but that is not at all clear.

The third cause for concern is that, while the pesticide plant was in operation, FCX employees routinely disposed of excess Lindane by pouring the Lindane on the ground outside of a plant window. The spot where the Lindane was poured was not paved at the time, but is now believed to be under a paved parking lot. It is the possibility that Lindane has contaminated the ground water that most alarmed EPA and the State of North Carolina and led to the site being proposed for inclusion on the National Priorities List[5] established pursuant to 42 U.S.C. § 9605.

Lindane, the most soluble of the pesticides at the site, is a CERCLA hazardous substance for which the safe drinking water standard is 4 parts per billion.[6] In February, 1986, Fred C. Hart Associates sampled the four test wells and found that one well, Well #3, contained a Lindane level of 58 parts per billion—more than 14 times the present safe drinking water standard. EPA and the State of North Carolina maintain that the high Lindane level in Well #3 shows that Lindane, either from the soil above Well #3[7] or from the pit beneath the warehouse, has contaminated the ground water. That contamination, according to the governments, poses an immediate threat to approximately 12,000 residents who rely for their drinking water on wells located within a three mile radius of the site.

FCX's consultants, however, adamantly dispute the governments' conclusion on this point. They contend that Lindane has not contaminated the ground water and argue that the site does not present an immediate health hazard to the residents in the area. To begin with, the FCX consultants believe that the test results for Well #3 are suspect because of improper techniques used by Fred C. Hart Associates in drilling the well. Specifically, FCX's consultants believe that an unsterilized drilling auger came in contact with Lindane in the soil and transported the pesticide to the water in Well #3.[8] After the surface structure of Well #3 had been damaged and could no longer be tested, FCX's experts drilled another well, Well #3A, three feet from Well #3. A sample taken from Well #3A in August, 1988, contained a Lindane level of 3.4 ppb, within the safe drinking water level of 4 ppb. Dangerously high levels of Lindane were later found in Well #3A in tests conducted in October, 1988 (19 ppb), and in January, 1989 (54 ppb), but FCX's consultants maintain that these high levels only indicate a small pocket of contamination caused by the drilling of Well #3. The first test of Well #3A does give some credence to the idea that Well #3 was polluted during drilling.

With the exception of the tests of Well #3 and Well #3A, all tests of other wells at the site have demonstrated Lindane levels at lower than the present safe drinking water standard (see "FCX Exhibit #8"). FCX's consultants believe that, of these tests, the test results for Well #1 are the most significant, because, in their opinion, Well #1 has the lowest gradient. They reason that, if Lindane had polluted the ground water, the contamination would have migrated to the lowest point and should be detected in samples from Well #1. Tests of the water in Well #1 do indicate the presence of Lindane, but at

5. The Statesville facility has been assigned a Hazard Rating Score of 37.94—a site is generally included on the National Priority List if its Hazard Rating Score exceeds 28.5.

6. A proposal is pending to reduce the safe water drinking level for Lindane to .2 parts per billion.

7. Well #3 is thought to be situated in the area where the FCX employees poured Lindane on the ground.

8. It is not disputed that the drilling auger should have been, but was not, steam cleaned.

levels within the current safe water drinking standard (02/86—.33 ppb; 05/86—less than the measurable test limit of .4 ppb; 08/88—.18 ppb; 10/88—.2 ppb; 01/89—.38 ppb). Lindane was detected in a sample of Well # 4 in February, 1986, at a safe level of .11 ppb, but was not found in three tests of Well # 2, was not found in a well located on property adjacent to the site, and was also not found in six off site wells recently tested by the State of North Carolina. The fact that, except for the tests at Wells # 3 and 3A, Lindane has not been detected at high levels 20 years after the dumping or burial of the Lindane at the site convinces FCX's consultants that Lindane does not present an immediate hazard to public health.

FCX's consultants also believe that, even if Lindane were to be found in the ground water at the site at higher levels than presently detected, the health of Statesville residents would not be jeopardized because most of the people in the area are served by a public city water system which draws water from sources more than seven miles from the debtor's facility. The property appears to drain to the southeast, an area served by city water, and the ground water, based on the water levels in the test wells, appears also to slope in the same direction, but that is by no means certain.

The governments say that more than 12,000 residents drink water from wells located within a three mile radius of the FCX facility, but the governments' evidence is less than convincing on the accuracy of that number.[9] There may be residents in the area southwest of the site who use private wells for drinking, but the closest well used for drinking water is approximately one-half mile away. There are two wells which serve the Iredell County water system, but the closest well is approximately two miles up gradient to the north of the site.

Although the high levels of Lindane in Test Well # 3 and Well # 3A are of substantial concern, the court is not convinced that the presence of Lindane at the FCX site presents an immediate public health hazard to the residents of Statesville and the surrounding area. First of all, there is no satisfactory evidence to show the level of Lindane present on the property. Soil samples taken by Hart ("FCX Exhibit # 7"), the State of North Carolina ("FCX Exhibit # 7"), and EPA (testimony of Jan Rodgers) have not detected any Lindane in the ground. More importantly, in the twenty years since Lindane was poured on the ground by FCX employees it has not migrated to the lowest gradient test well (Well # 1) in sufficient quantity to exceed the present safe drinking water standard. That being so, the unknown amount of Lindane at the site cannot be said to present an immediate threat to the drinking wells in the area—the closest being one-half mile away.

FCX's consultants also contend that the pesticides buried under the building pose no immediate health threat. In fact, they believe that the pesticides could not be in a much safer place. After all, the chemicals are thought to be in a relatively small area (8 feet by 8 feet by ten feet) surrounded by clay and capped by a 73,000 square foot warehouse with a reinforced concrete floor. That is true, but there remain many troublesome and unanswered questions surrounding the contamination of the Statesville site, particularly relating to the pesticides buried in 1969. What pesticides are buried there? Where are they buried? How close is the ground water to the pit? Will the lateral movement of water in the soil eventually carry these pesticides to the ground water?

Soil and ground water samples at the site have shown the presence of DDT, Dieldrin, Chlordane, Methoxychlor, Mercury, and Dichloroethane, all hazardous substances under CERCLA.

**9.** Eight thousand of the 12,000 residents identified by the State of North Carolina receive their water from the Iredell County Water System which has two wells within a three mile radius of the facility. Both wells are up gradient from the site to the north and the closest of the two wells is two miles away. The remaining residents were identified by counting houses on a topographic map. It was "assumed" that these people used private wells. ("FCX Exhibit # 3.")

The pit may be covered with concrete, but the fact remains that the pesticides are not in an adequately contained repository. That is not acceptable. There are simply too many uncertainties concerning these dangerous substances to leave them in their present uncontrolled state. In these circumstances the buried pesticides present an immediate threat to public health and these pesticides should be removed without delay.

The costs of removal have been estimated to be $250,000 (testimony of Jan Rodgers and "Governments' Exhibit # 2") and the property should not be abandoned until that sum is set aside by FCX to cover the removal costs.

## DISCUSSION AND CONCLUSIONS

FCX seeks to abandon its former pesticide plant in order to avoid paying the costs necessary to clean up the facility to the standards required by CERCLA and the environmental laws of the State of North Carolina. It is not uncommon for trustees or debtors in possession to attempt to abandon property where the projected clean up costs exceed the projected "post clean up" value of the property. *In re 82 Milbar Boulevard Inc.,* 91 B.R. 213 (Bankr.E.D.N.Y.1988).[10]

The United States Supreme Court, however, has held that the court "does not have the power to authorize an abandonment without formulating conditions that will adequately protect the public's health and safety." *Midlantic National Bank v. New Jersey Department of Environmental Protection,* 474 U.S. 494, 106 S.Ct. 755, 762, 88 L.Ed.2d 859 (1986). EPA and the State of North Carolina contend that any violation of CERCLA constitutes a threat to the public's health and safety and that there can be no abandonment until the violation is remedied. The mere release of a CERCLA hazardous substance into the environment, according to the EPA, compels a finding of an imminent and substantial endangerment. Furthermore, EPA argues that the court is bound by EPA's determination and may not second guess EPA as to what constitutes a serious public health or safety risk. The court agrees that it may not substitute its judgment for that of EPA or the State of North Carolina as to whether there has been a CERCLA or state law violation, but whether there have been violations of CERCLA or state environmental law is not the test when the issue is abandonment. For the purposes of an abandonment controversy, the court, not EPA or the state, must determine if there is an immediate threat to public health and safety.

 The Fourth Circuit Court of Appeals has recently held that the limit which *Midlantic* places on the ability of the trustee or debtor in possession to abandon property is a narrow one. *In re Smith–Douglass, Inc.,* 856 F.2d 12 (4th Cir.1988).[11] Full compliance with all environmental laws is not required prior to abandonment, but abandonment is not authorized when there is an *immediate* threat to the public health and safety and an imminent danger of death or illness. *Id.* at 16. EPA argues that the holding of *Smith–Douglass* is not applicable here because that case involved a violation of state law. The result, however, is the same whether there is a violation of CERCLA or a violation of a state

**10.** The Bankruptcy Code does not provide a priority for environmental damage caused by a debtor's prepetition acts, and, even when public policy may favor a priority, the court may not create one when one does not exist. *In re Dant & Russell, Inc.,* 853 F.2d 700, 709 (9th Cir.1988); 3 L. King, *Collier on Bankruptcy* ¶ 507.02, at 507–17 (15th ed. 1988). The United States Supreme Court has held that a state's prepetition injunction directing the clean up of a hazardous waste site created no more than a general, unsecured claim not entitled to priority. *Ohio v. Kovacs,* 469 U.S. 274, 282–83; 105 S.Ct. 705, 709–10, 83 L.Ed.2d 649 (1985); *see also South-*
ern Railway Co. v. Johnson Bronze Co., 758 F.2d 137, 141 (3rd Cir.1985) and In re Dant & Russell, Inc., 853 F.2d 700 (9th Cir.1988).

**11.** The Ninth Circuit has also read the *Midlantic* exception narrowly. *In re Dant & Russell, Inc.,* 853 F.2d 700 (9th Cir.1988). Other courts, however, have given the *Midlantic* exception a broader interpretation. *In re Wall Tube & Metal Products Co.,* 831 F.2d 118 (6th Cir.1987); *In re Stevens,* 68 B.R. 774 (D.Me.1987); *In re Peerless Plating Co.,* 70 B.R. 943 (Bankr.W.D.Mich. 1987).

environmental law. The crucial determination is whether there is an immediate danger to the public health and that decision is made by the court.

 In this case the burial of five tons of pesticides in an uncontrolled condition presents an immediate threat to the health of those living in the area. In holding that the danger is imminent, the court recognizes that the environmental threat may not be fully manifested for several years. Nevertheless, the danger is immediate in the sense that there is a *present* and real possibility of public exposure to those deadly substances if they are not removed.

The court is also aware that, despite learning of the problem in May of 1986, neither the EPA nor the State of North Carolina commenced any enforcement action until after the notice for abandonment was filed.[12] While that may be some evidence that the governments did not consider this site to pose an immediate danger, it certainly does not decide the matter. EPA and state environmental agencies necessarily must proceed deliberately in such matters, but even when there is an inordinate delay, the court must find an immediate danger to public health if in fact one exists.

EPA and the State of North Carolina argue that the debtor has "unencumbered" funds from which it could pay all costs required by CERCLA. The funds, however, are not entirely unencumbered as they have been committed to the payment of other claims in accordance with the terms of the debtor's confirmed plan. The court has "broad discretion in determining whether to award administrative expense priority," *Dant & Russell, Inc.*, 853 F.2d 700, 707 (9th Cir.1988), and the circumstances of this case are such that only those costs reasonably required to remove the immediate threat will be given cost of administration status. If EPA or the State of North Carolina are inclined to proceed with further remediation activity, they shall have a lien on the property to the extent of the sums expended.

Based upon the foregoing, the abandonment of the debtor's Statesville property is allowed on the condition that FCX set aside the sum of $250,000 for the payment of clean up costs incurred by EPA or the State of North Carolina.[13] This sum shall be in addition to the $9,312.01 cost of administration priority claim previously allowed for the State of North Carolina for its investigative costs in connection with the property.

SO ORDERED.

12. On December 23, 1988, EPA notified FCX that FCX should undertake voluntary clean up activities. ("Governments' Exhibit # 3").

13. The court will allow abandonment of the property to either EPA or to the State of North Carolina if that is their preference. The court will also consider any request by EPA or the State of North Carolina to impose restrictions on the use of the property pending governmental clean up activity at the site.