**In re SHORE COMPANY, INC., a/k/a Shore Oil Company, Inc. Shore Oil Products, Triple A Sales, Shore Oil and Shore Incorporated, Debtors.**

**Bankruptcy No. TY–82–00229.**

United States Bankruptcy Court,
E.D. Texas,
Tyler Division.

Oct. 23, 1991.

Dale Thomas, White Oak, Tex., chapter 7 trustee.

Mike McNally, Lawrence and Lawrence, Tyler, Tex., for chapter 7 trustee/movant.

Timothy W. O'Neil, Atty./Adviser, U.S. Trustee, Tyler, Tex., for U.S. Trustee for E.D. of Tex.

Shawn Carmen, Asst. Regional Counsel, U.S. E.P.A., Dallas, Tex., for E.P.A./respondents.

Nancy Olinger, Christine Leopold, Asst. Atty. Gen., Environmental Protection Div., Austin, Tex., for State of Tex./Texas Water Com'n, respondents.

## OPINION

DONALD R. SHARP, Bankruptcy Judge.

This matter came on for consideration of the Trustee's Motion for Order of Abandonment of Refinery Property pursuant to a regularly scheduled hearing. This opinion constitutes findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052 and disposes of all the issues presented to the Court.

## FACTUAL AND PROCEDURAL BACKGROUND

Shore Company, Inc., hereinafter ("Debtor"), filed for protection under Chapter 11 of the Bankruptcy Code on May 21, 1982; however, Debtor's efforts to reorganize its oil refinery business were unsuccessful and the case was converted to a proceeding under Chapter 7 on December 14, 1983. While the Chapter 7 Trustee, hereinafter ("Trustee"), was able to readily liquidate the majority of Debtor's assets, the Trustee had great difficulty in selling three contiguous tracts of real property in Kilgore, Texas, on which Debtor's refinery operations were located.[1] Correspondingly, the Trustee was also unable to find buyers for the attendant personal property associated with the refinery. For the purpose of this opinion, both the real property and the personal property will be referred to as ("refinery property").

Throughout the succeeding years, the Trustee's efforts to sell the refinery property did not prove fruitful. In 1986 the Trustee commissioned a closure study for the express purpose of determining the estimated expense of closing and cleaning up the property to make it more attractive for buyers. There is no dispute that the clo-

---

1. The Chapter 7 Trustee testified that the refinery property is possibly encumbered by a first lien but that the validity of the lien is subject to a bona fide dispute. There is no dispute that the purported lien holder has taken no action thus far to enforce its lien.

sure study dealt only with remediating the surface of the refinery property. At that time, the conclusion of the closure study was that a remediation of the surface portion of the refinery property would cost approximately $30,000.00. However, funds were not allocated for closure of the refinery property and the Trustee's subsequent efforts to sell the property were unavailing.

On January 14, 1988, a new Chapter 7 Trustee was appointed in the case. Despite significant efforts toward securing a sale of the refinery property, the Trustee's efforts met with no success. After reviewing the case, the Trustee came to the decision that the only thing preventing this case from being closed was a disposition of this refinery property. After a considered review of the situation, the Trustee came to the opinion that the refinery property constituted a burden to the administration of the estate and given various environmental concerns and estimated remediation costs was of inconsequential value and benefit to the estate. In reaching this conclusion, the Trustee testified that his review of the financial status of this case indicated that the estate had approximately $374,000.00 in liquidated assets on hand; however, aggregate claims against the estate totaled approximately $370,000.00 attributable to Chapter 11 administration expenses, $114,-000.00 in prepetition priority expenses, and approximately 1.8 million dollars in prepetition unsecured expenses. As of the date of the hearing, the Trustee had not yet calculated the Chapter 7 administration expenses. Given the obvious lack of surplus funds in the estate for the clean-up of the refinery property[2] the Trustee was of the opinion that abandonment of the property pursuant to 11 U.S.C.A. § 554 was appropriate. Following the filing of the Trustee's Motion for Abandonment, the United States Trustee for the Eastern District of Texas filed a statement in support.

Two parties objected to the Trustee's Motion; the State of Texas, by and through its attorney general, on behalf of the Texas Water Commission, hereinafter ("TWC"), and the United States, by and through the attorney general, on behalf of the Environmental Protection Agency, hereinafter ("EPA"). The TWC first became involved with the Debtor in mid–1982 when it investigated allegations that the Debtor was illegally discharging waste into the ground water. After an investigation validated this allegation, the Debtor agreed to discontinue this practice. Pursuant to the TWC's investigation and the subsequent agreement, the Debtor also agreed to make various changes relating to the storage of various potentially harmful materials stored in pits on the property. The agreement specifically required the Debtor to line all pits used to hold tainted water from oil recovery operations; however, Debtor failed to comply. As a direct result of Debtor's non-compliance with the remediation agreement, the TWC filed an injunctive proceeding against Debtor later in 1982. However, since that time, no further action has been taken and enforcement of the injunction is still pending.

TWC, through its field officer, testified that the refinery property contains numerous chemical contaminants including cadmium, chromium and lead, although the level of contamination has not as yet been ascertained. The TWC further testified that it had never ratified the closure study report authorized by the Trustee in 1986. Instead, the TWC was of the opinion that if closure were attempted of the refinery property today, the closure cost would amount to anywhere between $100,000.00 to $200,000.00 in today's market. In spite of the contamination of the refinery property, the TWC representative admitted that operationally there was nothing in the area of the refinery property to cause imminent harm to the people around it. The current status of the TWC's 1982 investigation into

---

**2.** While the 1986 closure study indicated that a surface closure could be accomplished for approximately $30,000.00, the parties all seemed to accept the fact that today's closure costs would be potentially many times higher. This Court notes that those concerns are credible given the nature of oil refining and the fact that no study was made of sub-surface contamination.

the level of contamination of the oil property continues to be under review.

The second party objecting to the Trustee's abandonment of the refinery property is the EPA. Compared to the TWC, the EPA has only recently become acquainted with the refinery property. The enforcement officer for the EPA testified that on June 14, 1990, he visited the refinery property to conduct an on-site evaluation. The EPA testified that the visit was more in the nature of an orderly scheduled evaluation rather than a classic emergency response evaluation. With the aid of a technical assistance team, the EPA surveyed the site and conducted a variety of screening tests including air monitoring and a hazard characterization test. The purpose of the hazard characterization test is to characterize chemical substances to determine their environmentally hazardous propensities.

The EPA's investigation revealed several areas of concern. First, corroborating the testimony of the TWC, the EPA discovered that the earthen pits on the property storing the residual wastewater were unlined thus presenting a potential risk of surface or subsurface runoff. Second, the EPA found numerous 55 gallon drums containing very acidic clear liquids which were the result of previous fuel blending operations at the facility. Third, the EPA expressed concern over the numerous structures affixed to piping which had the potential for containing hazardous substances. Fourth, the EPA found asbestos-type insulation on the property. Fifth, the EPA expressed concern over the presence of two large storage tanks each containing approximately 200,000 gallons of oil sludge. Sixth, the EPA noted that the refinery property was not fenced. However, the EPA testified that it could present no evidence of the specific harm resulting from the presence of these various contaminants on the property. The EPA testified that while it has the current ability to effectuate a clean-up of the property, it has not completed its analysis of the substances present on the property to make the decision to initiate a clean-up. The EPA admitted that a necessary prerequisite to any decision to remediate a site requires a prior determination that the site poses some degree of danger.

## DISCUSSION OF LAW

■ After notice and a hearing, a trustee may abandon property which is burdensome to the administration of the estate or is of inconsequential value and benefit to the estate. 11 U.S.C.A. § 554(a) However, when the property sought to be abandoned by the trustee is environmentally-impacted, the trustee's discretion to abandon is not so unlimited.

The leading case addressing the issues presented for consideration by this Court is *Midlantic Nat. v. New Jersey Depart.* 474 U.S. 494, 106 S.Ct. 755, 88 L.Ed.2d 859 (1986). At first blush, the *Midlantic* case appears very similar to the factual scenario in the case at hand. In *Midlantic*, a Chapter 7 trustee attempted to abandon two facilities previously used by a debtor to process waste oil. Abandonment was urged due to the inability of the trustee to effectuate a sale of the property. There was no disagreement that the property was both a burden to the estate and of inconsequential value. In the procedural trail that followed, the bankruptcy court order granting the trustee's motion to abandon the properties was appealed and reversed by a divided panel of the Third Circuit Court of Appeals whose holding was subsequently appealed to the Supreme Court.

In affirming the Third Circuit Court of Appeals the Supreme Court held that:

the Bankruptcy Court does not have the power to authorize an abandonment without formulating conditions that will adequately protect the public's health and safety. Accordingly, without reaching the question whether certain state laws imposing conditions on abandonment may be so onerous as to interfere with the bankruptcy adjudication itself, [it is the holding of this Court] that a trustee may not abandon property in contravention of a state statute or regulation that is reasonably designed to protect the public health and safety from identified hazards.

474 U.S. at 507, 106 S.Ct. at 762. In fact, the Court found that the trustee's act of abandonment had aggravated the potential for harm due to the removal of 24–hour guard service and the shut-down of the fire-suppression system. 474 U.S. at 498 n. 3, 106 S.Ct. at 758 n. 3. However, this seemingly broad holding was tempered by a much-celebrated footnote to the term "identified hazards" in the last sentence, the substance of which has spawned considerable disputes in the resultant caselaw:

> This exception to the abandonment power vested in the trustee by § 554 is a narrow one. It does not encompass a speculative or indeterminate future violations of such laws that may stem from abandonment. The abandonment power is not to be fettered by laws or regulations not reasonably calculated to protect the public health and safety from *imminent or identifiable harm.* (emphasis added)

474 U.S. at 507 n. 9, 106 S.Ct. at 762 n. 9.

Numerous post-*Midlantic* cases have wrestled with the conditions under which a trustee may abandon or be required to clean up environmentally hazardous estate property. Some cases interpret the *Midlantic* decision broadly to require trustees to accommodate state or federal environmental laws or regulations. In *In re: Wall Tube & Metal Products Co.*, 831 F.2d 118 (6th Cir.1987) the court of appeals, in reversing the decisions of the lower courts, held that the State of Tennessee was entitled to an administrative expense for remediation costs incurred in cleaning up a debtor's property. The court reasoned that the Tennessee laws authorizing the clean-up were designed to protect the public health and safety from readily identifiable environmental hazards. *Id.* at 122. Since the *Midlantic* decision would have prevented the Chapter 7 trustee from abandoning the estate property in the face of these laws, the court of appeals reasoned that the Chapter 7 trustee was also prevented from either maintaining or possessing the property "in continuous violation of that same law." *Id.* As a result, the State, in remediating the property, was performing a service already obligatory on the part of

the trustee and hence, the State was entitled to an administrative claim.

Similarly, in *In re: Peerless Plating Co.,* 70 B.R. 943 (Bankr.W.D.Mich.1987) the EPA had incurred post-petition expenses in cleaning up environmentally hazardous estate property. In this case, the EPA discovered the environmental hazard within days of the filing of debtor's petition under Chapter 7. EPA immediately initiated a response which had cost over $130,000.00 at the time a request was made for an administrative expense. There was not a dispute that the clean-up expenses would continue to accumulate or that the aggregate clean-up expenses alone would exceed the assets held by the estate. As in *Wall Tube,* the *Peerless* court gave a broad reading to the *Midlantic* decision. Even though the court admitted that the EPA had failed to proffer any evidence that there was an immediate and identifiable danger on the estate property, the court nonetheless was of the opinion that the record as a whole demonstrated a finding of imminent harm. The *Peerless* court reasoned as did the *Wall Tube* court that since the trustee could not abandon the property under *Midlantic* an implicit duty was created on the part of the trustee to remediate the environmental impact of the hazards through the expenditure of all of the estate's unencumbered funds. *Id.* at 948. The court reasoned that since the EPA had discharged the trustee's responsibility in cleaning up the environmental hazard the EPA had shouldered a burden of the trustee and hence was entitled to an administrative expense. *See also In re: Stevens,* 68 B.R. 774 (Bankr.D.Me.1987)

Other cases, when faced with similar factual dilemmas, have required, in order to prevent a trustee from abandoning environmentally-impacted estate property or requiring a trustee to clean-up the property, that a showing be made that the environmental hazard contaminating the estate property presents an imminent and identifiable harm to the public health and welfare.

In *In re: Smith–Douglass, Inc.,* 856 F.2d 12 (4th Cir.1988) the court of appeals ruled that absent a showing of imminent

harm, a Chapter 11 trustee was entitled to abandon a fertilizer plant even though the plant contained violations of the environmental laws of the State of Illinois. The court reasoned that its holding was consonant with the *Midlantic* decision since there had been no demonstration at the lower court level of the imminency of harm. *Id.* at 16. However, while it was not an issue in this case,[3] the court of appeals held that "where the estate has unencumbered assets, the bankruptcy court should require stricter compliance with state environmental law before abandonment is permitted." *Id.* at 17.

Several bankruptcy courts have echoed the holding in *Smith–Douglass*. In *In re: FCX, Inc.*, 96 B.R. 49 (Bankr.E.D.N.C. 1989) a Chapter 11 debtor proposed to abandon property consisting of a pesticide blending plant on which approximately five tons of pesticide was buried in an indeterminate location. The EPA in the State of North Carolina opposed debtor's motion and argued that the mere release of a hazardous substance compelled a finding by the court that the estate property presented "an imminent and substantial endangerment." *Id.* at 54. The court, after emphasizing that *its* judgment, not that of the EPA, is dispositive on a finding of imminent harm, found that the presence of the five tons of pesticide did indeed constitute an imminent and identifiable harm. As a result, the court required, as a prerequisite to abandonment of the property, that the debtor set aside a sum of $250,000.00 in its plan for future clean-up costs. *Id.* at 55.

Not surprisingly, some courts have had to deal with situations in which the cost of remediation vastly exceeds the available assets of the estate. In *In re: Franklin Signal Corporation*, 65 B.R. 268 (Bankr. D.Minn.1986) the Chapter 7 trustee attempted to abandon 14 drums containing hazardous waste. The court found that the cost of removal of these barrels would exceed $20,000.00—over and above the $17,-000.00 in administrative expenses which had already been incurred. Against this amount, the Chapter 7 estate only had approximately $10,000.00 in assets. After finding that the trustee had discharged his duty by making a preliminary investigation into the nature of the hazard posed by the barrels of waste and subsequently informing the relevant state and federal agencies of the situation, the court allowed the trustee to abandon the property. The court found that the barrels of waste constituted more of a nuisance than an imminent danger. *Id.* at 273. Furthermore, even though some unencumbered funds existed that could have been potentially applied to a clean-up, the court chose not to require the estate to exhaust its funds in pursuit of the clean-up. *Id.*

Similarly, in *In re: Microfab, Inc.*, 105 B.R. 161 (Bankr.D.Mass.1989), even after a finding of an imminent and identifiable harm to the public, the court refused to order a Chapter 7 trustee to clean-up estate property which contained approximately 20 contaminants in concentrations high enough to be classified as hazardous under Massachusetts law in spite of the fact that the Chapter 7 estate contained approximately $750,000.00 in unencumbered assets. Given that remediation of the site would cost almost two million dollars, the court held that it was unwilling to order an exhaustion of the estate's funds if the end result would not significantly improve the condition of the estate property. *Id.* at 170. Furthermore, the court was unwilling to entertain the state's claim for clean-up costs as administrative expenses until the expenses were actually incurred. In the opinion of the *Microfab* court, passing judgment on the propriety of administrative expenses prior to the expenses actually being incurred is in essence an advisory opinion. *Id.* at 170.

Another case the Court wishes to address is the case of *In re: Anthony Ferrante & Sons, Inc.*, 119 B.R. 45 (Bankr. D.N.J.1990). In many ways, the *Ferrante* case is factually similar to the case at hand. In *Ferrante*, the Chapter 7 trustee moved to abandon a contaminated public water supply system. The contamination had

---

**3.** The estate had no unencumbered funds.

been known to the New Jersey Department of Environmental Protection ("NJDEP") for at least seven years prior to the filing of debtor's Chapter 7 petition. While during this period NJDEP had issued a series of directives to debtor requiring remediation, very little was done in terms of actual enforcement until several weeks after the filing of debtor's petition. NJDEP's half-hearted response to the trustee's motion to abandon the public water system also impressed the court with its lack of urgency. On appeal, the district court affirmed the bankruptcy court's order of abandonment citing a lack of showing that the water supply system constituted an imminent and identifiable harm to the public. The court reasoned that the hazard presented more of a nuisance rather than a clear danger. The inaction on the part of the State of New Jersey in delaying enforcement of its administrative orders for eight years figured significantly in the court's assessment of the lack of imminent danger. *Id.* at 50. Furthermore, the court held that abandonment would not aggravate any danger purportedly contained on the property. *Id.* The court correctly viewed the controversy as less concerned with an issue of public endangerment rather than a matter of fiscal accountability and concluded that while "the state may be forced to bear the expense of remedial measures, when that expense should have been born by [debtor] before it filed for bankruptcy, is perhaps unfair but nonetheless not a basis for restriction of the powers given a trustee under the Bankruptcy Code." *Id.* at 50. In finding that the property abandoned did not present an imminent and identifiable danger to the public, the court, in adopting a restrictive view of *Midlantic,* affirmed the bankruptcy court's order of abandonment. *Id.*

A careful review of the *Midlantic* decision and resultant case law convinces this Court that a trustee's right to abandon environmentally impacted estate property is limited only by the precondition that the trustee remediate any imminent and identifiable danger present on the property proposed to be abandoned. This Court is unwilling to adopt the broad reading of the *Midlantic* decision as endorsed by the *Wall Tube* and *Peerless* courts. In holding as it did, the Supreme Court opined that "the bankruptcy court does not have the power to authorize an abandonment without formulating conditions that will adequately protect the public's health and safety." 474 U.S. at 507, 106 S.Ct. at 762. That sentence was modified by the following sentence which provided that any state laws or regulations posed as conditioning the trustee's abandonment power be "reasonably designed to protect the public health and safety from identified hazards." *Id.* Finally, the preceding sentences were both qualified by famed footnote nine which held that the Supreme Court's decision in *Midlantic* was to be construed narrowly and only in cases in which there has been a showing of an "imminent and identifiable harm" on the property proposed to be abandoned. *Id.* In accordance with the dictates of the Supreme Court, this Court construes the conditions under which a trustee can be prohibited from abandoning environmentally impacted estate property narrowly and in doing so concludes that the TWC and the EPA have wholly failed to demonstrate an imminent and identifiable harm contained in the estate property.

This Court is not unmindful that the property in question is indeed environmentally impacted. While the TWC and the EPA failed to offer evidence of the extent of the environmental hazards present on the property, this Court is convinced that in all likelihood the property is in violation of the laws of the State of Texas as well as relevant federal environmental laws. However, violation of state and federal environmental laws is not enough to limit the trustee's powers of abandonment nor, is the recognition that a former oil refinery site probably contains some hazardous substances sufficient. There must be a showing that the violation constitutes an imminent and identifiable harm. Such a showing has not been made.

The State of Texas, through its Water Commission, first became apprised of Debtor's environmental violations as far back as 1982. From that point forward, the actions

of the TWC vis-a-vis the Debtor have been tepid at best with little in the way of substantive enforcement being effected. Finally, even though the TWC expressed concern at the environmental state of the refinery property, the TWC admitted that operationally there was nothing in the area of the refinery to cause imminent harm to the people around it. This Court places great weight on the lack of activity on the part of a state agency charged with protecting the health and welfare of the people of the State of Texas. Given the lack of action on the part of the TWC, this Court can only conclude that it has long been the judgment of the TWC that the refinery property constituted more of an environmental concern than an immediate danger. Any other conclusion by this Court would require a finding that if indeed the refinery property constituted an immediate threat to the public that the TWC has been derelict in its duty. *See In re: Purco* 76 B.R. 523, 533 (Bankr.W.D.Pa.1987)

■ As previously stated, the involvement of the EPA with the Debtor's refinery property has not been nearly as lengthy. The date it first became aware of a potential environmental hazard on the refinery property is not known. Again, the manner in which the EPA conducted its investigation convinces this Court that the refinery property does not present an imminent danger to the public. As testified, the EPA's first visit to the refinery property was in the nature of an orderly scheduled evaluation rather than a classic emergency response. The EPA testified that the refinery property contained numerous environmental hazards, both surface and sub-surface. However, while the testimony of the EPA convinced the Court that the property in question did have very serious environmental concerns, the Court was left with a final conclusion that these concerns did not identify an imminent danger to health or safety so as to preclude the trustee's right to abandon the property. The EPA could not offer any evidence of any specific harm arising from the contamination of the property. Unlike the *Peerless* court, this Court is unwilling to give great deference to the conclusory opinions of the EPA which are

not premised on hard fact. *See Peerless,* 70 B.R. at 947. Rather, this Court is more in accord with the opinion of the *FCX* court in concluding that final determinations of the imminency of threats to the public health and safety are to be determined by the court and not the EPA. 96 B.R. at 54. Finally, this Court places great weight on the testimony of the EPA that while it had the present ability to effectuate a clean-up of the property it had not yet done so because a necessary prerequisite to any decision to effectuate a clean-up is a determination that a site poses some degree of environmental danger. Again, the Court must draw its conclusions from the noticeable lack of urgency in the EPA's response.

Furthermore, this Court finds that, unlike the situation in *Midlantic,* abandonment will not aggravate the potential for harm to the public. The refinery property is not currently fenced nor has any testimony been proffered that it has been fenced for any appreciable period during the last nine years. Similarly, the refinery property is not guarded by a watchman. Also, the Court notes that the property is located in an industrial area. Simply put, there is no condition on the refinery property that would be aggravated by the Trustee's abandonment. In fact, except for the periodic attempts of the Chapter 7 Trustee to sell the property, the property has been de facto abandoned for almost a decade. In this Court's opinion, it is time to make that abandonment de jure.

■ A final issue which this Court wishes to address concerns the question of whether notwithstanding a lack of showing of imminent and identifiable harm, the Court should fashion a remedy to employ the unencumbered assets of the estate for the purpose of clean-up of the property. At first blush, this is a compelling proposition that numerous other courts have embraced. However, this Court is unwilling to do so.

■ While it is true that what distinguishes this case from many other similar cases is the availability of unencumbered estate funds, this Court is not convinced

**580**

that fashioning a remedy utilizing these unencumbered funds in a clean-up is permissible or even advisable. First, 11 U.S.C.A. § 503(b)(1)(A) provides that a bankruptcy court may allow administrative expense priority for "the actual, necessary cost and expenses of preserving the estate ..." It is evident to the Court that neither the EPA or the TWC has expended any resources dedicated to the remediation of the refinery property. As such, until such an expense is incurred in furtherance of a clean-up of the refinery property, this Court is of the opinion that any discussion of the propriety of the award of administrative expense status to either the EPA or TWC is premature. *See In re: Microfab, Inc. supra.*

■ Second, under this Court's interpretation of the *Midlantic* decision, the Chapter 7 trustee is entitled to abandon environmentally impacted property if it does not contain an imminent and identifiable hazard which threatens the public welfare. This Court has already concluded that no evidence has been offered to demonstrate that the hazard present on the refinery property rises to such a level as to preclude abandonment. Courts do not freely accord administrative expense status in the absence of a showing that the expense was an actual and necessary cost of preserving the estate. Since the Chapter 7 Trustee has already concluded that abandonment of the refinery property would be in the best interests of the estate, no basis exists for the award of administrative expenses for the clean-up of the refinery property. Such expenditure would only serve to deplete the estate while at the same time yield no contemporaneous benefit.[4]

Third, this Court has strong reservations that the policy considerations of the bankruptcy reorganization process even supports the arguments tendered by the EPA and the TWC to in effect award administrative expense priority to the clean-up of the refinery property. The *Midlantic* case and numerous of the cases following it have either stated or intimated that when estate property contains the type of hazard which threatens imminent and identifiable harm to the public, the trustee is obligated to expend unencumbered estate assets to, at a minimum, reduce the immediacy of the threatened harm. However, as recognized by other courts, the Bankruptcy Code does not provide in all other cases involving environmental clean-ups that clean-up costs be accorded administrative priority status. *In re: Dant & Russell, Inc.*, 853 F.2d 700, 709 (9th Cir.1988) (Courts are not free to formulate their own rules of super- or sub-priorities within a specifically enumerated class); *In re: Jensen,* 127 B.R. 27, 33 (9th Cir. BAP 1991) For these reasons, this Court is unwilling to provide that the future clean-up costs of the refinery property be accorded administrative status.

For these reasons, it is the opinion of this Court that the Trustee's Motion for Abandonment of Refinery Property should be and is GRANTED.

---

4. In this Court's opinion, depletion of the estate is a relevant, albeit not overriding, concern to be considered by the court. *E.g. In re: Microfab, Inc.* 105 B.R. 161, 170 (Bankr.D.Mass.1989);

*In re: Franklin Signal Corp.* 65 B.R. 268, 274 (Bankr.D.Minn.1986); *contra In re: Peerless Plating Co.* 70 B.R. 943, 947 (Bankr.W.D.Mich. 1987).