**In re DOYLE LUMBER, INC., Debtor.**

**Bankruptcy No. 90–01073.**

United States Bankruptcy Court,
W.D. Virginia,
Danville Division.

Feb. 11, 1992.

Alexander W. Bell, Lynchburg, Va., for trustee.

W. Alan Smith, Jr., trustee.

John R. Butcher, Asst. Atty. Gen., Com. of Va., Richmond, Va., Stephen G. Bass, Danville, Va., for Osmose Wood Preserving, Inc.

A. Carter Magee, Roanoke, Va., for debtor.

## MEMORANDUM OPINION

WILLIAM E. ANDERSON, Chief Judge.

Before the court are the objections of the Commonwealth of Virginia and Osmose Wood Preserving, Inc. to the proposed abandonment by the chapter 7 trustee, pursuant to 11 U.S.C. § 554, of a wood processing plant located in Henry County, Virginia owned by the debtor, Doyle Lumber, Inc. Also before the court is the trustee's motion to dismiss this case in the event abandonment is not allowed.

## FACTS

At the time the debtor filed a petition under chapter 11 of the Bankruptcy Code on July 30, 1990, it was engaged in saw mill and wood treating activities at locations in Henry County, Virginia and Vance County, North Carolina. From July 30, 1990 until June 13, 1991, it operated the business as a debtor-in-possession, however it was unable to successfully reorganize or liquidate its assets while proceeding under chapter 11.

The case was converted to chapter 7 on June 13, 1991, and W. Alan Smith, Jr. was appointed the chapter 7 trustee. The notice setting the meeting of creditors required by 11 U.S.C. § 341(a) contained the following statements:

Creditors: Do NOT file claims at this time. Debtor schedules indicate no as-

sets exist from which to receive a dividend.

and

> This notice shall serve as a general intent to abandon property of no value or is burdensome to the estate. [sic] Creditors will receive no further notice of such sales and/or abandonments unless a request is filed within 15 days of this notice with the Clerk. Upon the trustee filing an intent to sell and/or abandon property, objections must be filed with the Clerk within 15 days.

On June 19, 1991, counsel for the debtor filed a notice stating that all of its officers and directors had resigned on June 13, 1991.

On September 24, 1991, the chapter 7 trustee filed a notice stating his intention to abandon the bankruptcy estate's interest in the saw mill and wood treating facility located in Henry County, Virginia. In the abandonment notice, the trustee stated that the assessed value of the real property proposed to be abandoned was $500,000.00, and that the property secured obligations of approximately $3.3 million. In paragraph 5 of the notice, the trustee stated that:

> Because of the use of the chemical compound chromated copper arsenate in the wood treating process at the plant for many years, there may be environmental damage to the property where the plant is located, and the remedial costs associated.

The trustee therefore proposed to abandon the property because there was no equity in it for the benefit of the unsecured creditors and because the property was burdensome to the administration of the estate.

On September 27, 1991, Osmose Wood Preserving, Inc. filed an objection to the trustee's proposed abandonment of the Henry County property. Osmose, which holds the first lien against the real property, acknowledged in its objection that the value of the property was less than the debt it secured. The grounds for the objection were that Osmose was in the process of attempting to find a buyer for the property and had offered the trustee a $14,000.00 commission if he would act as a conduit for delivery of title of the property when it was sold. In Osmose's view, the payment of the commission would benefit the unsecured creditors.

On October 9, 1991, the Commonwealth of Virginia, through its Hazardous Waste Management and State Water Control Boards, also filed an objection to the abandonment of the Henry County facility.[1] The Commonwealth objected to the abandonment of the property unless the bankruptcy estate brought the facility into compliance with the Virginia Hazardous Waste Management Regulations and complied with the terms of a State Water Control Board permit.

Prior to ending its business operations, the debtor had used a chromated copper arsenate ("CCA") treatment process to manufacture treated lumber at the Henry County facility. The CCA treatment solution contains arsenic, chromium, and trace contaminant lead. While lumber was being treated at the facility, the process tanks, treatment cylinder and treatment pad sump used in the treatment operation contained the CCA treatment solution. On May 14, 1991, while the debtor was still operating the facility, the Commonwealth inspected it and found it to be in compliance with the Virginia Hazardous Waste Management Regulations.

After the wood treatment operation was discontinued in June 1991, the CCA solution that remained on the equipment used in the treatment process became "hazardous wastes." According to the Commonwealth, the failure to dispose of the contents of the sump, treatment cylinder, and process tanks within 90 days of the cessa-

---

1. No objections were filed by the Commonwealth or any other party to prior abandonment notices filed by the trustee concerning other real property of the debtor in which there also was no equity. (See the intent to abandon property filed on August 5, 1991.) Similarly no objection was filed when the trustee consented to the entry of an August 16, 1991 order lifting the automatic stay in order to allow a secured creditor to sell machinery and equipment located at the Henry County, Virginia saw mill and wood processing facility.

tion of manufacturing operations caused them to become "hazardous waste management units" subject to regulation under the Virginia Hazardous Waste Management Regulations ("VHWMR"), VR 672–10–1 (Dept. of Waste Management, July 1, 1991) §§ 3.1C and 11.1.[2] Because wastes contained in these units were not disposed of when the treating operations were terminated, the Commonwealth contends that they must be "closed" in accordance with 28 U.S.C. § 959 and VHWMR § 9.6.[3] The Commonwealth also asserts that when the facility was in operation, the debtor handled waste sludge from the treatment process in such a manner that the concrete pad located at the facility is deemed to be a "regulated unit" and is also required to be closed pursuant to § 9.6L of the VHWMR. The simple fact that the debtor terminated lumber treatment operations at the Henry County facility created the "closing" obligations, not any misuse or mishandling of the CCA solution or the equipment in which it was used.

The regulations make "owners" and "operators" responsible for closing hazardous waste management units and the regulated unit. Owner is defined in the Virginia Hazardous Waste Management Regulations as "the person who owns a hazardous waste management facility" and operator is defined as "the person responsible for the overall operation of a hazardous waste management facility." See VR 672–10–1 (Dept. of Waste Management, July 1, 1991), Part 1, Definitions.

In 1989, the debtor applied for a Virginia Pollutant Discharge Elimination System Permit ("VPDES") for rainfall surface runoff at the treatment facility that flows into state waters at three points. This runoff reaches a creek which is classified under the Commonwealth of Virginia Water Quality Standards, VR 680–21–08.10 (State Water Control Board, July 1, 1990) as a public water supply. Even though the debtor applied for a permit in 1989, the State Water Control Board did not issue one until September 23, 1991. The VPDES permit as issued requires monitoring for toxic contaminants, and allows the State Water Control Board to impose effluent limitations to protect the public water supply after the monitoring has established a sufficient data base.

The Commonwealth was aware when it issued the permit that the debtor's chapter 11 reorganization case had been converted to chapter 7 and that it had ceased treatment and other business operations in June 1991. The permit, which was approved for issuance on September 13, 1991, was nevertheless issued in the name of Doyle Lumber, Inc. and not in the name of the trustee.[4] The following statement is included in the staff comments section of the memorandum approving the issuance of the permit: "The discharge is not controversial and is currently meeting the required limitations."

The Commonwealth argues that the trustee, as the owner and operator of the Henry County facility,[5] is required to use

---

**2.** The court is neither adopting or rejecting the Commonwealth's interpretation of any applicable Virginia regulations.

**3.** It appears to the court that closing consists, at least in part, of removing, transporting, treating, storing and/or disposing of the hazardous waste and its residues; sampling and testing surrounding soils to determine the extent of any contamination; removing or decontaminating contaminated equipment, structures and soils; and controlling rainwater run-on and rain-off and monitoring for possible ground water contamination. See VR 672–10–1 (Dept. of Waste Management, July 1, 1991), § 9.6.

**4.** The permit itself contains the following statements: "The staff is aware that the property and lumber treating operation may be sold to

achieve liquidation bankruptcy settlement. Please be aware that this permit cannot automaticaly [sic] be transferred to a new owner."

**5.** For purposes of this opinion the court will assume, without deciding, the correctness of Commonwealth's contention that the chapter 7 trustee is an "owner" and "operator" for purposes of the Virginia Hazardous Waste Management Regulations. It is not at all clear to the court, however, that in the absence of an order pursuant to 11 U.S.C. § 721 authorizing the trustee to operate the business of the debtor, the trustee should in fact be considered an owner or operator, even in the technical sense that those terms are used in the VHWMR. See 11 U.S.C. §§ 704 and 721, setting forth the duties of the trustee and requiring court approval to operate the business of a debtor.

funds in the bankruptcy estate to prepare and execute closure plans for the hazardous waste management units and the regulated unit located at the facility. The Commonwealth also contends that the trustee should be required to expend estate funds to begin the water monitoring required by the VPDES permit. Because of these environmental obligations, the Commonwealth urges the court not to allow the trustee to abandon the property.

The trustee argues that 11 U.S.C. § 554 allows abandonment in this case, and that in any event the bankruptcy estate contains insufficient funds to accomplish what the Commonwealth proposes be done. At the hearing held on December 18, 1991, the trustee testified that the debtor's bankruptcy estate contained approximately $51,-000.00 [6], of which up to $15,000.00 has already been committed to paying an accountant retained by the estate. The trustee also testified that additional administrative expenses would necessarily be incurred. According to the trustee, the only remaining assets in the estate are possible preference and lender liability claims, none of which have even been fully investigated.

Based on inquiries he had made, the trustee stated that he believed that the costs of closing the treatment facility in accordance with the Virginia Hazardous Waste Management Regulations and of beginning the monitoring required by the Virginia Pollution Discharge Elimination System permit would greatly exceed all funds presently available to, or likely to be obtained by, the bankruptcy estate. Therefore, on November 13, 1991, the trustee moved the court to dismiss this case if he is not allowed to abandon the Henry County facility.

## DISCUSSION

The abandonment statute, 11 U.S.C. § 554(a), provides that:

> After notice and a hearing, the trustee may abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate.

Everyone agrees that there is no money for the debtor's bankruptcy estate in the Henry County facility, and that no other benefit would accrue to the estate by continuing to hold the property. The trustee therefore argues that he is entitled to abandon the property pursuant to the express terms of section 554.

■ The trustee's right to abandon is not absolute, however. In *Midlantic Nat'l Bank v. New Jersey Dept. of Environmental Protection*, the United States Supreme Court held that, despite the literal language of the statute, when Congress enacted section 554(a) it did not grant the trustee the right to "abandon property in contravention of a state statute or regulation that is reasonably designed to protect public health or safety from identified hazards." 474 U.S. 494, 507, 106 S.Ct. 755, 762, 88 L.Ed.2d 859 (1986). Abandonment was not allowed in *Midlantic*,[7] but the Supreme Court noted that the exception it recognized to the trustee's abandonment power is narrow, and that:

> It does not encompass a speculative or indeterminate future violation of such laws that may stem from abandonment. The abandonment power is not to be fettered by laws or regulations not reasonably calculated to protect the public health or safety from imminent and identifiable harm.

*Id.* at 507, n. 9, 106 S.Ct. at 762, n. 9.

■ The Court of Appeals for the Fourth Circuit has also narrowly interpret-

---

**6.** Most of the funds in the estate were obtained when the debtor's Vance County, North Carolina wood treating facility was sold free and clear of liens on July 26, 1991. Dominion Bank, N.A. held a first lien deed of trust on that property which secured a debt of $1,849,813.05 plus interest. The trustee and the Bank agreed to the entry of an order whereby the property was sold for $1,600,000.00. Pursuant to the order, $60,000.00 of the proceeds was dispersed to the chapter 7 bankruptcy estate of the debtor, even though there was no equity in the property.

**7.** In *Midlantic,* the debtor filed bankruptcy after it was discovered that the company had violated environmental regulations by specifically violating an operating permit and after negotiations for cleanup had begun.

ed the *Midlantic* exception. In the view of the court of appeals, the exception applies only "where there is a serious health risk, not where the hazards are speculative or may await appropriate action by an environmental agency." *In re Smith–Douglass*, 856 F.2d 12, 16 (4th Cir.1988). While a bankruptcy court does not have the power to substitute its judgment for that of the state as to what constitutes a serious public health or safety risk, it is the bankruptcy court's responsibility to determine whether risk of imminent harm exists. Abandonment cannot be authorized, however, "without conditions that will adequately protect the public's health and safety in accordance with the governing state law." *Id.* at 16. The Fourth Circuit also held that the financial condition of the debtor is relevant to the required *Midlantic* analysis. Because the costs of cleaning up environmental violations could be an administrative expense, the bankruptcy court should require stricter compliance with state environmental law before abandonment is permitted when the estate has unencumbered assets. *Id.* at 17.

Apparently only one opinion involving abandonment has been published by a court in the Fourth Circuit since *Midlantic* and *Smith–Douglass*. In *In re FCX, Inc.*, 96 B.R. 49, 54–55 (Bkrtcy.E.D.N.C.1989), Bankruptcy Judge Small reiterated the Fourth Circuit's conclusion that the crucial determination in an abandonment controversy like the one before this court is whether there is an *immediate danger* to the public health and safety and that the bankruptcy court, not the state, must make that determination.[8] Although there are cases in other circuits which have not interpreted the *Midlantic* exception as narrowly

as the Fourth Circuit, recent cases are in accord with *Smith–Douglass*. *See, e.g., In re Anthony Ferrante & Sons, Inc.*, 119 B.R. 45 (D.N.J.1990) and *In re Microfab, Inc.*, 105 B.R. 161 (Bkrtcy.D.Mass.1989). *But see, In re Wall Tube & Metal Products Company*, 831 F.2d 118 (6th Cir.1987).

■ The facts of this case do not reveal an immediate threat to the health and safety of the public. The Henry County facility was inspected on March 7, 1991, before the debtor ceased operations, and found to be in compliance with the Virginia Hazardous Waste Management Regulations. The evidence indicates that the debtor was in compliance with applicable regulations at the time that it ceased operations in June 1991.

The Henry County facility consists of approximately 20 acres of which the site where the lumber was treated constitutes only a small part. No lumber has been treated at the site since the case was converted to chapter 7 and the trustee was appointed. One of the environmental violations urged by the Commonwealth as a justification for not allowing abandonment, is the fact that steps to close the hazardous waste management units (the process tanks, treatment cylinder, treatment pad sump and concrete pad) at the treatment site have not been undertaken. The fact that the equipment has not been cleaned and disposed of, that chemical residue, if any, has not been disposed of, and that soil and groundwater testing have not been conducted, does not constitute an immediate threat to the health and safety of the public as that concept is defined in the Fourth Circuit's *Smith–Douglass* decision.[9]

8. The facts in *In re FCX, Inc.* were strikingly different than those before this court. In that case there were five tons of pesticides buried in an uncontrolled condition. The costs of removal were estimated at $250,000.00. The chapter 11 debtor-in-possession stated in its disclosure statement that costs of clean up would constitute a cost of administration, but nevertheless contended later that if the property was abandoned the clean up costs would not be administrative costs. The court found the buried pesticides to be an immediate danger to the public health, and conditioned approval of the abandonment of the property where they were locat-

ed on the debtor setting aside $250,000.00 for the payment of clean up costs incurred by Environmental Protection Agency or the State of North Carolina.

9. While there was testimony at the December 18, 1991 hearing that rainwater running off the treatment pad into the underlying sump had caused the sump to overflow onto the pad, and might do so again, the testifying witness, who was the hazardous waste enforcement chief for the Virginia Department of Waste Management, did not state or imply that this possibility constituted an immediate threat to the health and

Although the court understands that the Virginia Hazardous Waste Management Regulations regarding the closing obligation only became applicable after the actual treatment operations were terminated, there was no evidence that the unused facility is in any way more of an immediate threat than when it was actively being used to treat lumber. If there is soil or water contamination at the site which might constitute a public health or safety risk, it would have been caused prior to the trustee's appointment when the facility was being used to treat lumber. As noted above, however, the facility was in compliance with the applicable environmental regulations when inspected in March 1991. While appropriate environmental testing and clean up procedures should of course be performed at the facility, it has not been shown that the failure to compel the chapter 7 trustee to perform the testing and other closure procedures in any way constitutes an immediate danger to the public health.

Similarly, the fact that monitoring the rainwater runoff has not yet begun does not constitute an immediate threat to the health and safety of the public. The Commonwealth allowed the facility to operate without a permit prior to June 1991. Since that time no lumber has been treated at the site. There has been no evidence that conditions at the Henry County facility are regressing, or in any way immediately threaten the public. Indeed, the Commonwealth stated on September 13, 1991 that the discharge was not controversial.

■■■ The fact that there will be few or no unencumbered assets for distribution to the creditors in this case favors abandonment. It is likely that the costs of the initial soil and water testing and monitoring would greatly exceed any funds in the bankruptcy estate. The likelihood that additional assets will be recovered is speculative. There is no question that the costs of completing the closing process required by the VHWMR would far exceed any funds

available to the trustee. Osmose's contention that abandonment should not be allowed because it would pay the trustee a $14,000 commission to convey title to the Henry County facility to a purchaser, does change the situation. The proposed sale is not certain, and it is doubtful that the trustee could or should be compelled to convey property in which the estate has no equity interest.

The Commonwealth in effect requests that the trustee not be allowed to abandon the Henry County facility until he identifies and remediates potential environmental hazards on the property, or spends whatever funds are in the estate attempting to do so. Even if it was shown that the facility in its present condition was an immediate threat to the public safety, which is not the case, this court has reservations regarding the ability of a chapter 7 trustee to perform identification and remediation procedures like those requested by the Commonwealth. A chapter 7 trustee does not function like a debtor-in-possession or a trustee in a chapter 11 case. The chapter 7 trustee's duties as set forth in section 704 of the bankruptcy Code are inconsistent with arranging and supervising environmental remediation. While in some cases it might be appropriate to require the bankruptcy estate to pay for some or all of the costs of investigation and remediation, that is not the same thing as requiring the trustee to undertake such actions.

This case is not one in which past violations of environmental regulations have created an immediate and serious threat to the public health and safety like in *Midlantic* and *FCX, Inc.* Nor has it been shown that any delay that might result from the abandonment in accomplishing the closing and monitoring activities required by the applicable Virginia environmental regulations will pose such a threat. Finally, in this case the bankruptcy estate does not possess sufficient funds to perform such activities. The exception to the trustee's abandonment power recognized by the

safety of the public. Although not required to do so as a condition of abandonment, if the chapter 7 trustee deems it appropriate, he may

take such measures as are practicable to eliminate the overflow.

United State Supreme Court in *Midlantic* is not applicable to the facts before the court.

For the foregoing reasons, this court will enter an order overruling the objections of the Commonwealth of Virginia and of Osmose Wood Preserving, Inc. to the abandonment of the debtor's Henry County, Virginia saw mill and wood treatment facility, thereby allowing the trustee to abandon the property pursuant to 11 U.S.C. § 554(a). The trustee's motion to dismiss will be denied.