In re VIRGINIA BUILDERS,
INC., Debtor.

FIRST VIRGINIA BANK OF
TIDEWATER, Plaintiff,

v.

VIRGINIA BUILDERS, INC., Defendant.

Bankruptcy No. 91–25505.
Adv. Pro. No. 92–2088.

United States Bankruptcy Court,
E.D. Virginia,
Norfolk Division.

April 20, 1993.

Joseph R. Mayes, Richard E. Biemiller, Wolcott, Rivers, Wheary, Basnight .& Kelly, P.C., Virginia Beach, VA, for plaintiff.

Charles W. Best, Jr., Cynthia A. Boretsky, Norfolk, VA, for debtor.

Donna J. Hall, Clark and Stant, P.C., Virginia Beach, VA, Chapter 7 trustee.

### MEMORANDUM OPINION

DOUGLAS O. TICE, Jr., Bankruptcy Judge.

This adversary proceeding comes before the court on plaintiff bank's complaint for injunctive relief to force the removal of debris from its property and requesting that environmental clean up costs plaintiff has incurred be given administrative expense priority pursuant to 11 U.S.C. § 503(b)(1)(A). For the reasons set forth in this memorandum opinion, the court concludes that plaintiff's environmental remediation costs are entitled to administrative expense priority under 11 U.S.C. § 503(b)(1)(A).

### Findings of Fact

In 1984, London Bridge Industrial Park II ("LBII"), a Virginia general partnership,

purchased the property, London Bridge Industrial Park, from Roy E. Widgeon ("Widgeon"). Widgeon owned the property for fifty years prior to the sale, and during that time, farmed and maintained a water well drilling business on the land. Widgeon did not store oil or gas on the property and although he operated some vehicles, all fuelling and maintenance were completed off site. This evidence, coupled with the lack of evidence as to any "midnight dumping" on the property, indicates that the current contamination on the LBII property was not caused by Widgeon, nor did it arise during Widgeon's ownership.

Shortly after the LBII purchase, Virginia Builders, Inc. ("Virginia Builders"), began operating on the property with full consent of LBII.[1] Virginia Builders stored and maintained over 30 vehicles, including heavy equipment, on the property. The maintenance consisted primarily of refuelling and oiling. Fuel tanks containing diesel and waste oil were located throughout the property. On the eastern side of the property stood a tin shed with a concrete floor. Virginia Builders used the shed to repair vehicles and store tools.

In 1988, plaintiff First Virginia Bank of Tidewater extended loans to LBII, secured in part by a first priority deed of trust on the property and in part by a security interest in unrelated property owned by LBII. In May 1990, the LBII loans were in default. In light of impending foreclosure, the bank ordered a Phase I environmental study to determine the extent of any environmental contamination. On June 20, 1990, McCallum Testing Laboratories ("McCallum") conducted a Phase I study consisting of a visual inspection of the property. Although McCallum found some surface staining near the shed, it concluded that, "We do not consider this property to be contaminated at present or to have a potential to pose a threat to the environ-

ment or public health." (Plaintiff's Exhibit 1, p. 3, 8). Further investigation on the property was not recommended.

Concerned with possible reinspection 90 days after the Phase I environmental study, the debtor's management remedied the environmental concerns addressed in McCallum's study by cleaning up and placing hay bales and chemical absorbent around the shop area. Until Cohan left Virginia Builders in December 1990, the debtor attempted to maintain the cleanliness of the property. Cohan testified that when he left Virginia Builders in December, he was unaware of anything, including "midnight dumping," which would have contaminated the property beyond what was found during the Phase I study. It is apparent that as of December 1990, the environmental contamination currently at issue was not present.

In January 1991, Gerald Wolfe ("Wolfe") succeeded Cohan as day-to-day manager of the debtor. In the Summer of 1991, the City of Virginia Beach received a complaint about the manner in which vehicles were being cleaned by the debtor, and city officials formally inspected the premises. The evidence indicated that workers were steam cleaning vehicles, including the engines, on the Virginia Builders property and permitting the petroleum products to fall to the ground and run into a ditch. It was only after the city's inspection that Wolfe became aware that, "[W]e [the debtor] were really not doing what we should have done to make sure that we were complying with the laws." (R. at 126). Wolfe admitted that Virginia Builders did not have the proper equipment and therefore was not properly caring for the disposal of waste oil. However, the president of Virginia Builders, Darrel Hughes, made no effort to remedy the situation.[2]

1. Francis H. Cohan ("Cohan") and Darrel J. Hughes ("Hughes") were shareholders in both LBII and Virginia Builders, thus facilitating the agreement between the parties. Hughes was the President of Virginia Builders, whereas Cohen served as the day-to-day manager.

2. After the inspection by city officials, Wolfe notified Hughes of the substandard waste disposal practices. Hughes acknowledged these practices; however, adequate waste disposal equipment was never provided and the debtor continued to clean the vehicles in the same manner.

The evidence demonstrated that in 1991 the conditions of the property had drastically changed since the preliminary environmental study. Wolfe characterized the condition of the property as deplorable. The shed was in disarray, and workers had to use flashlights to compensate for the inadequate lighting. Large amounts of spilled oil covered the concrete slab floor, and employees resorted to haphazardly changing the oil wherever the equipment was located on the property. Few remedial measures were taken, and usually the waste oil would drain directly onto the soil. It is apparent that during this period the environmental contamination became extensive.

On July 31, 1991, the bank foreclosed on the property. However, the debtor continued to occupy and operate on the property. On October 2, 1991, the debtor filed its petition for chapter 11 bankruptcy. Despite repeated requests and negotiations with the debtor's principals, the bank resorted to formal letters demanding the debtor to stop operations and remove debris from the property. The debtor did not cease operations and vacate the property until May 1992.

Although debtor insists that the environmental contamination on the property occurred prepetition, the contamination was incessant, occurring both prepetition and postpetition. Despite testimony by Hughes that no vehicles or equipment were refuelled or maintained on site after September 25, 1991, the balance of evidence indicates the debtor did not cease but continued to refuel on the property through the time of its withdrawal in May 1992.[3]

On April 29, 1992, the bank received an anonymous letter alleging a possible environmental hazard on the property. (Plaintiff's Exhibit 2). Bank officials immediately inspected the premises, finding debris on the property, the area around the fuel tanks stained, significant standing diesel fuel on the ground, and the shed floor heavily stained with petroleum. A drainpipe leading from the shed to a nearby ditch revealed petroleum residue. The bank immediately ordered McCallum to perform a Phase II environmental study. The Phase II environmental study tested both soil and groundwater samples from the site and confirmed that the property had drastically deteriorated since the 1990 Phase I study.

The testing revealed that diesel fuel and petroleum contaminants existed in the top 2–4 feet of soil. The extent of soil contamination registered up to 17,482 parts per million ("ppm"), greatly exceeding the State Water Control Board ("SWCB") limit of 100 ppm.[4] McCallum attributed the contamination primarily to surface spillage seeping vertically downwards. McCallum experts found the contamination to be gradual and credited the extensive environmental damage to "sloppy housekeeping practices" over a period of time. (Plaintiff's Exhibit 5, p. 6). McCallum's report recommended a cleaning up of the property (i.e., "remediation").

Although the bank did not report the violation to the SWCB in accord with state regulations and the recommendation of McCallum, the bank proceeded to clean up ("remediate") the property. Due to the level of contamination, the evidence indicated that the SWCB would likely have directed remediation by the bank.

The bank solicited estimates and ultimately selected Vico Construction Company ("Vico"), which provided the lowest estimate. Clean up began on 175 cubic yards of soil, but during the remediation process, the engineers determined additional soil

---

3. Moreover, the parties' stipulation before trial seems to contradict Hughes' testimony at trial. The Stipulations of Parties Order states:

> 10. *Subsequent to the Bank's acquisition of the Property and the Debtor's bankruptcy filing,* the Debtor ... performed service and maintenance work, including the fueling and oiling of vehicles and equipment, on the Property....

> 12. All of the items referred to in paragraphs 7 and 10 were not removed from the Property until May 1, 1992.

Stipulation of Parties Order, p 3. (emphasis added).

4. Although some of the other borings registered less than 17,000 ppm, experts testified that seepage follows paths of least resistance resulting in lower concentrations in some areas.

had to be removed.[5] As of the date of trial, up to 300 cubic yards of soil had to be removed, and the work was still in progress.

## Position of the Parties

### FIRST VIRGINIA BANK OF TIDEWATER.

Plaintiff asserts that Virginia Builders caused the contamination of approximately 300 cubic yards of soil on London Bridge Industrial Park property. Plaintiff relies on the two environmental studies performed by McCallum Laboratories to pinpoint the timing of the contamination. Plaintiff further relies on the stipulation agreement entered into between the parties to prove ongoing contamination. Plaintiff contends that since the contamination occurred prepetition and postpetition, plaintiff is entitled to an administrative expense priority for costs of compliance to cure environmental damage.

### VIRGINIA BUILDERS, INC.

Virginia Builders argues that it is not liable for the environmental damage and that the Bank has no cause of action arising out of the condition of the property. Debtor argues that plaintiff does not allege any federal or state law violation. Further, debtor asserts that the remediation was superfluous because the bank never notified the appropriate regulatory agency and thus did not know if remediation was necessary.

Debtor further asserts that the plaintiff should not receive administrative expense priority for its clean up costs. Debtor argues that any contamination occurred prepetition. Debtor also contends that since it did not own but was merely a trespasser on the property, the bank's clean up did not benefit the estate of the debtor and therefore should not be accorded priority under 11 U.S.C. § 503(b)(1)(A).

## Discussion and Conclusions of Law

The issues before the court center on the environmental contamination of the property on which debtor operated its business. First the court must determine whether Virginia Builders, operating on the bank's property, is responsible for the environmental contamination. If so, the court must then determine whether the remediation costs are allowable as an administrative expense under 11 U.S.C. § 503(b)(1)(A) or whether such costs constitute a general unsecured claim.

The evidence is uncontroverted that Virginia Builders was the sole responsible party for the environmental contamination found on the property. The evidence indicates that the prior owner, Widgeon, did not store oil or maintain vehicles on the premises, and therefore any environmental contamination occurred subsequent to 1984 when he sold the property. As of 1990, the Phase I environmental study verified that, despite some minor concerns, the property was not polluted. However, in 1991, the operations of the debtor changed, and the environmental contamination began. The Phase II environmental study confirmed overt violations of SWCB regulations, with pollutants registering over 17,000 ppm on the property. This contamination is directly attributable to the debtor and occurred beyond the bankruptcy filing, finally ceasing when Virginia Builders was forced to vacate the premises in May 1992.

■ The obligation to remediate the property must arise out of state or federal environmental law. If there is no obligation under non-bankruptcy law, then under bankruptcy law there is no duty to clean up the property. The debtor's contamination of the property was in violation of Virginia law, and the debtor was obligated to clean it up.[6] Furthermore, the stat-

---

5. The evidence demonstrated that the bank, at all times, concerned itself with keeping remediation costs at a minimum. The bank not only selected the construction company with the lowest estimate, but chose remediation options which were less expensive (i.e., removing the tin shed rather than trying dig underneath the shed so as to remediate the contaminated soil). Furthermore, a McCallum geologist supervised Vico's efforts and fully supported the determination that an additional 125 cubic feet of soil needed to be removed.

6. The discharge of oil upon state lands is strictly prohibited.

ute provides that the SWCB has the authority to contain and clean up the site[7] and charge the responsible parties for the necessary costs.[8] Debtor contends that the bank should not recover because the SWCB was not formally notified, and therefore remediation may have been unnecessary. Notwithstanding the bank's failure to formally notify the SWCB, its recovery is not precluded. The evidence indicated that SWCB relies heavily on private industry to determine the magnitude of contamination and based upon those recommendations, determines whether clean up is necessary. Testimony indicated that due to the gravity of contamination, the SWCB would have ordered remediation in this case. The pollution caused by Virginia Builders was in excess of state regulations and in violation of state law; the fact that formal action did not compel clean up does not affect the liability of Virginia Builders or the claim of the bank.

██ Certain claims are entitled to administrative expense priority by virtue of 11 U.S.C. § 503(b)(1)(A).[9] Since there is no specific provision in § 503(b) giving priority to environmental claims, the general rule has been to accord environmental claims general unsecured status. *See In re Microfab*, 105 B.R. 161, 167 (Bankr.D.Mass.

> A. The discharge of oil into or upon state waters, lands, or storm drain systems within the Commonwealth is prohibited ...
> B. Any person discharging or causing or permitting a discharge of oil into or upon state ... and any operator of any facility ... from which there is a discharge of oil into or upon state ... lands ... *shall, immediately upon learning of such discharge or threat of discharge, implement any applicable oil spill contingency plan approved under this article or take such other action as may be necessary to contain and clean up such discharge* ...
> Va.Code Ann. § 62.1–44.34:18 (Michie 1992) (emphasis added).

7. In the event of such discharge or threat of discharge, if it cannot be determined immediately the person responsible therefor, or if the person is unwilling or unable to promptly contain and clean up such discharge or threat of discharge, the Board may take such action as is necessary to contain and clean up the discharge or threat of discharge, including the engagement of contractors or other competent persons ...
Va.Code Ann. § 62.1–44.34:18(B) (Michie 1992).

1989). However, environmental claims have been conferred administrative status based on three grounds: (1) the timing of the damage; (2) the provisions of 28 U.S.C. § 959(b) (Supp.1991), which direct trustees and debtors in possession to act within bounds of state law; and (3) the judicially created exception found in *Midlantic Nat'l Bank v. New Jersey Dept. of Environmental Protection*, 474 U.S. 494, 106 S.Ct. 755, 88 L.Ed.2d 859 (1986). I find that the bank's actual costs incurred in cleaning up the property qualify for administrative expense priority on all three grounds.

Courts have consistently construed the language of § 503(b)(1)(A) broadly. In *Reading Co. v. Brown*, 391 U.S. 471, 485, 88 S.Ct. 1759, 1767, 20 L.Ed.2d 751 (1968), the Court found that negligence damages inflicted postpetition gave rise to necessary costs of administering the estate, thus elevating the claim to administrative status. In *In re Charlesbank Laundry, Inc.*, 755 F.2d 200 (1st Cir.1985), the Second Circuit relied on *Brown* and held that a civil compensatory fine for a debtor's violation of an injunction qualified for first-priority treatment as an administrative expense, even though the injunction arose from proceedings involving nuisance rather than negligence. The court stated that:

8. Virginia law provides:
> Any person discharging ... oil into or upon state ... lands ... shall be liable to:
> 1. The Commonwealth of Virginia or any political subdivision thereof for all costs and expenses of investigation, containment and cleanup incurred as a result of such discharge or threat of discharge ...
> 4. Any person for injury or damage to person or property, real or personal, loss of income, loss of the means of producing income, or loss of the use of the damaged property for recreational, commercial, industrial, agricultural or other reasonable uses, caused by such discharge.
> Va.Code Ann. § 62.1–44.34:18(C) (Michie 1992).

9. 11 U.S.C. § 503(b)(1)(A) provides:
> (b) After notice and a hearing, there shall be allowed, administrative expenses ... including—(1)(A) the actual, necessary costs and expenses of preserving the estate, including wage, salaries, or commissions for services rendered after the commencement of the case.

[I]f fairness dictates that a tort claim based on negligence should be paid ahead of pre-reorganization claims, then *a fortiori*, an intentional act which violates the law and damages others should be so treated....

*Charlesbank Laundry, Inc.*, 755 F.2d at 203.

Environmental damages occurring postpetition have also fallen within the necessary costs of preserving the estate and have been afforded administrative expense priority.[10]

Most environmental claims encompass a hybrid of prepetition and postpetition damage. The contamination usually begins as a result of a debtor's prepetition activities and continues causing further property damage postpetition. *See* Arlene E. Mirsky, *et al.*, *The Interface Between Bankruptcy and Environmental Laws*, 46 Bus. Law. 626, 654 (1991). Courts generally hold that the entire remediation cost qualifies as an administrative expense in these hybrid scenarios.[11] Moreover, one com-

mentator suggests that simply allowing the property to remain contaminated postpetition is a new harmful act sufficient to elevate clean up costs to administrative expense priority. *See* Kathryn R. Heidt, *The Automatic Stay in Environmental Bankruptcies*, 67 Am.Bankr.L.J. 69, 124 (1993).

The environmental contamination caused by debtor in this case occurred both prepetition and postpetition. The evidence indicated that contamination began at some point in 1991, and the parties apparently stipulated that Virginia Builder's operations continued through May 1992. The bank incurred the cost to remedy the contamination, and in my view these costs qualify as administrative expenses.

Although the Supreme Court has not specifically ruled on the priority status of environmental claims, it has addressed the relationship between the Bankruptcy Code and environmental law. In *Ohio v. Kovacs*, 469 U.S. 274, 283, 105 S.Ct. 705, 710, 83 L.Ed.2d 649 (1985), the Court held that a

---

**10.** *See, e.g., United State Dept. of Interior v. Elliott*, 761 F.2d 168, 172 (4th Cir.1985); *In re Hemingway Transport, Inc.*, 126 B.R. 656, 661 (D.Mass.1991), *aff'd* 954 F.2d 1 (1st Cir.1992).

However, some courts have denied administrative expense priority in situations in which environmental contamination took place prepetition. *See In re Dant & Russell, Inc.*, 853 F.2d 700 (9th Cir.1988); *Southern Ry. Co. v. Johnson Bronze Co.*, 758 F.2d 137 (3rd Cir.1985).

Other courts have held that prepetition release of hazardous wastes as defined in 42 U.S.C. § 9601(14) (Supp.1988) or under state law will be entitled to administrative priority. *In re Chateaugay Corp.*, 944 F.2d 997, 1009 (2nd Cir. 1991); *In re Wall Tube & Metal Products Co.*, 831 F.2d 118 (6th Cir.1987).

Debtor relies on *In re Dant & Russell, Inc.*, 853 F.2d 700 (9th Cir.1988) and *Southern Railway Co. v. Johnson Bronze Co.*, 758 F.2d 137 (3rd Cir.1985) to support its position. I find both cases distinguishable or otherwise unpersuasive.

In *Johnson Bronze* the plaintiff was not seeking administrative expense priority under § 503(b)(1)(A) for out-of-pocket clean up costs. The case focused on whether clean up costs could be elevated to secured status. The court found that even assuming plaintiff had subrogation rights in a state administrative order directing clean up, plaintiff's right could rise no higher than the state which had not reduced its order to judgment. Furthermore, *Johnson Bronze* was decided before the Supreme Court's decision in *Midlantic*, and in light of the Su-

preme Court's emphasis on public health and safety, *Johnson Bronze* is questionable precedent.

*Dant & Russell* involved a claim for *prospective* costs of cleaning up toxic waste released by a debtor *prepetition*. The court denied administrative priority because the property was not owned by the bankruptcy estate. However, the court noted that, "[q]uite a different result ... is warranted when the clean up costs result from monies expended for the preservation of the bankruptcy estate." *Dant & Russell*, 853 F.2d at 709 (citing *In re Wall Tube*, 831 F.2d at 124; *In re Vermont Real Estate Inv. Trust*, 25 B.R. at 806; *In re Stevens*, 68 B.R. at 783).

The bank's position in this case is that its actual costs of clean up should be given administrative priority since the estate was benefitted by having an obligation performed on its behalf. The estate benefitted to the extent that a potentially massive liability has been alleviated, and preserved to the extent that debtor will not be liable for additional civil penalties for its environmental violations. Therefore, in my view the bank's actual clean up costs satisfy the administrative priority standard of § 503(b)(1)(A), and to the extent *Dant & Russell* may be inconsistent with this analysis I find it unpersuasive.

**11.** *See In re Smith–Douglass, Inc.*, 856 F.2d 12, 17 (4th Cir.1988); *In re Wall Tube*, 831 F.2d 118 (6th Cir.1987); *In re Stevens*, 68 B.R. 774 (D.Me. 1987); *In re Conroy*, 144 B.R. 966 (Bankr. W.D.Pa.1992).

debtor's obligation to clean up hazardous waste under a state injunction was dischargeable. However, the Court limited its decision by stating:

> [W]e do not question that anyone in possession of the site ... must comply with the environmental laws of the State.... Plainly that person or firm may not maintain a nuisance, pollute the waters of the State, or refuse to remove the source of such conditions....

*Kovacs,* 469 U.S. at 285, 105 S.Ct. at 711.

The Court's emphasis on compliance with state law was further expressed in *Midlantic,* where the Court recognized an exception to the general rule treating environmental clean up obligations as general unsecured claims. *See In re Microfab, Inc.,* 105 B.R. 161, 168 (Bankr.D.Mass. 1989).[12] *Midlantic* involved a chapter 7 trustee who sought to abandon property pursuant to 11 U.S.C. § 554(a) which contained waste oil contaminated with PCBs. The Court stated 28 U.S.C. § 959(b)[13] evidences congressional intent that trustees and debtors in possession are not to have carte blanche to ignore non-bankruptcy law. *Midlantic,* 474 U.S. at 505, 106 S.Ct. at 761. Thus, a trustee could not abandon property in violation of a state statute or regulation reasonably designed to protect the public health or safety from identified hazards. *Midlantic,* 474 U.S. at 507, 106 S.Ct. at 762. In essence, the Court found that the priorities of the bankruptcy code must acquiesce to laws designed to protect the public health and safety. *Midlantic,* 474 U.S. at 507, 106 S.Ct. at 762; *see also In re Stevens,* 68 B.R. 774, 783 (D.Me. 1987).

Cases following *Midlantic* grant administrative priority for environmental clean-up costs by relying either on compliance with state law via 28 U.S.C. § 959(b)[14] or the Court's emphasis on public health and safety. *See e.g., In re Wall Tube,* 831 F.2d 118, 124 (6th Cir.1987); *In re Vermont Real Estate Inv. Trust,* 25 B.R. 804 (Bankr.Vt.1982).

I find this case substantially similar to *In re Wall Tube,* which involved a debtor/lessee that operated a manufacturing plant. The Tennessee Department of Health and Environment found prepetition environmental damage from the hazardous waste by-products of manufacturing and assessed violations of both state and federal environmental law. *In re Wall Tube,* 831 F.2d at 122. The state cleaned up the site and sought reimbursement under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") 42 U.S.C. § 9601–9607 (1983 & Supp.1992).

---

**12.** However, the Court did not address the specific issue of whether the remediation costs incurred by the state of New York were entitled to administrative expense priority. *Midlantic,* 474 U.S. at 498 n. 2, 106 S.Ct. at 758 n. 2. Rather, the Court explicitly confined its holding to the issue of whether or not a chapter 7 bankruptcy trustee could abandon property pursuant to § 554(a) that was polluted in violation of state law; the Court held he could not.

Recently, Judge Anderson distinguished *Midlantic* in holding that a chapter 7 trustee could abandoned property that was allegedly polluted in violation of Virginia law. *In re Doyle Lumber, Inc.,* 137 B.R. 197 (Bankr.W.D.Va.1992). However, in *Doyle* there was absolutely no proof that the property in question was ever in violation of Virginia law. Rather, the Commonwealth argued that *Midlantic* required the trustee to conduct extensive testing to insure that the property was in compliance with state law. Judge Anderson held that for *Midlantic* to apply there must be an actual threat to public health and safety, not mere suspicion or innuendo. *In re Doyle,* 137 B.R. at 202–03; *accord In the*

*Matter of MCI, Inc.,* 151 B.R. 103, 107–08 (E.D.Mich.1992); *In re Jr. Food Mart of Arkansas, Inc.,* 144 B.R. 423, 425 (Bankr.E.D.Ark. 1992).

In this case there is no question that the property was in violation of a state law reasonably designed to protect public health and safety, and I am unwilling to substitute my judgment for that of the Commonwealth as to what constitutes a serious public health and safety risk.

**13.** 28 U.S.C. § 959(b) states, in relevant part:

[A] trustee ... appointed in any cause pending in any court of the United States, including a debtor in possession, shall manage and operate the property in his possession as such trustee ... according to the requirements of the valid laws of the State in which such property is situated, in the same manner that the owner or possessor would be bound to do if in possession thereof.

**14.** *See In re N.P. Mining Co., Inc.* 963 F.2d 1449 (11th Cir.1992); *In re Laurinburg Oil Co., Inc.,* 49 B.R. 652 (Bankr.M.D.N.C.1984).

The court relied on the special emphasis in *Kovacs* and *Midlantic* regarding the importance of complying with state law and protecting public health and safety. Since the State of Tennessee, in the absence of compliance by the debtor's estate, was entitled by state law to expend funds to remediate the contamination, those expenses were actual and necessary to preserve the estate so as to keep it in compliance with state law and to protect the public health and safety. *In re Wall Tube*, 831 F.2d at 124; *see also In re Stevens*, 68 B.R. 774, 783 (D.Me.1987); *In re Kent Holland Die Casting & Plating Inc.*, 125 B.R. 493 (Bankr.W.D.Mich.1991) (citing *In re Wall Tube*, 831 F.2d at 118); *In re FCX, Inc.*, 96 B.R. 49, 55 (Bankr.E.D.N.C.1989); *In re Peerless Plating Co.*, 70 B.R. 943, 949 (Bankr.W.D.Mich.1987).[15]

In this case, the debtor could not have avoided liability imposed by Virginia law if the Commonwealth had directed the clean up, and the weight of the evidence suggests the SWCB would have mandated clean up due to the high level of contamination.

Moreover, the debtor is liable under Virginia law to private parties for negligently or intentionally causing property damage arising from environmental contamination.[16] The bank expended funds to clean up the site which in the court's view were actual and necessary to bring the estate in compliance with state law, and to eliminate a threat to public health and safety. Accordingly, the court must conclude the actual costs of remediation incurred by the bank are entitled to administrative expense priority.

The court will enter judgment in favor of plaintiff by a separate order. The amount of the claim will be determined by the court after plaintiff submits appropriate documentation. The court also defers ruling on plaintiff's request for attorney fees until an itemized statement is submitted.

**15.** Although *Wall Tube* involved hazardous waste under CERCLA, the state law which debtor violated in this case is also reasonably calculated so as to protect public health and safety.

Moreover, Virginia law has similar provisions to the federal statute that also subject owners and operators to remediation obligations and possible tort liability. *See* Va.Code Ann. § 62.1–44.3 (defining "owner" as including "operator"); Va.Code Ann. § 62.1–44.34:18(C) (providing for cleanup and tort liability); *see also* 42 U.S.C. § 9601(20)(A) (defining "owner or operator"); 42 U.S.C. § 9607(a)(4) (providing for remedial and tort liability)  Clearly, CERCLA is more comprehensive than Virginia law, but I find that in this case, the potential threat to the public health and safety is sufficient to warrant a parallel analysis to those cases involving the federal statute.

**16.** Va.Code Ann. § 62.1–44.34:18(C)(4) (Michie 1992).